834 F.2d 1488
 10 Fed.R.Serv.3d 693
 John S. HERRINGTON, David S. Herrington and Quail Hill
Ranch, a partnership, Plaintiffs/Appellees/Cross-Appellants,
v.
COUNTY OF SONOMA, Defendant/Appellant/Cross-Appellee.
 Nos. 86-2620, 86-2728.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted July 15, 1987.
Decided Dec. 24, 1987.
As Amended Feb. 10, 1988.
 
 Jess S. Jackson, Barbara R. Banke, and Frederik A. Jacobsen, San Francisco, Cal., for plaintiffs/appellees/cross-appellants.
 James P. Botz, Santa Rosa, Cal., Antonio Cosby-Rossmann, Anita E. Ruud, San Francisco, Cal., for defendant/appellant/cross-appellee.
 John K. Van de Kamp, Atty. Gen., of the State of Cal., Andrea Sheridan Ordin, Chief Asst. Atty. Gen., N. Gregory Taylor, Theodora Berger, Asst. Attys. Gen., Craig C. Thompson, Richard M. Frank, Deputy Attys. Gen., Sacramento, Cal., for amicus curiae State of Cal. ex rel. John K. Van de Kamp, Atty. Gen.
 Michael H. Remy, Sharon E. Duggan, Remy & Thomas, Sacramento, Cal., for Western Sonoma County Rural Alliance.
 Appeal from the United States District Court for the Northern District of California.
 Before CHOY, Senior Circuit Judge, SNEED and TANG, Circuit Judges.
 CHOY, Senior Circuit Judge:
 
 
 1
 John and David Herrington (the "Herringtons") brought suit under 42 U.S.C. Sec. 1983 against the County of Sonoma (the "County") for, inter alia, alleged violations of their procedural due process, substantive due process, and equal protection rights secured under the Fourteenth Amendment. The constitutional claims arise out of the County's rejection of the Herringtons' subdivision application, and the subsequent downzoning of the area in which the Herringtons' land is located. The County appeals from a judgment awarding the Herringtons injunctive relief and a jury award of $2,500,600 in damages. We uphold the jury's verdict that the County is liable for due process and equal protection violations, and affirm the award of injunctive relief. We vacate the award of damages as grossly excessive, and remand for a new trial on the damages issue.
 
 BACKGROUND
 
 2
 The Herringtons own a 540-acre property in Sonoma County, ten miles west of the town of Sebastopol. The property once operated as a dairy farm; the dairy operation was shut down in 1962 after being cited for polluting a stream. The Herringtons then leased their land to local farmers for grazing and production of oat hay. The farming efforts were largely unsuccessful, and, in 1976, the Herringtons contacted the County planning staff about the possibility of residential development of their property. Over the next two years, the Herringtons--in consultation with the County planning staff--began to prepare a subdivision proposal. The Herringtons originally envisioned a 103-unit residential development. The proposal became less ambitious over time in accordance with the planning staff's recommendations.
 
 
 3
 Meanwhile, between 1976-78, the County was preparing its General Plan. California law requires each county to have a valid and internally consistent general plan. Cal. Gov't Code Sec. 65300 (West 1987). The general plan is a "statement of development policies" consisting of "a diagram or diagrams and text setting forth objectives, principles, standards, and plan proposals." Id. Sec. 65302. It has been described as " 'a constitution for all future development[ ].' " deBottari v. Norco City Council, 171 Cal.App.3d 1204, 217 Cal.Rptr. 790, 795 (1985) (quoting O'Loane v. O'Rourke, 231 Cal.App.2d 774, 42 Cal.Rptr. 283, 288 (1965)). The general plan creates the basis for subsequent planning efforts, such as specific plans. See Cal. Gov't Code Secs. 65450-57 (West 1987). Development proposals which are inconsistent with the general plan must be rejected by the governing authority. Id. Sec. 66474(a) (West 1983).
 
 
 4
 Before the Herringtons formally initiated the subdivision application process, the County planning staff instructed the Herringtons to delay filing an application until the General Plan was complete. In January 1978, the County adopted its General Plan. The General Plan set a maximum density of 35 residential units for the Herrington property. The plan also contained qualitative policy goals in favor of maintaining the County's agricultural viability and preserving its forest resources. The 35-lot maximum on the Herrington property was subject to reduction if necessary to protect the General Plan's environmental goals.
 
 
 5
 From 1978-79, the Herringtons continued to work with the planning staff to develop an acceptable subdivision proposal. According to the Herringtons, the staff gave them no indication that the evolving proposal would be inconsistent with the General Plan. On May 24, 1979, the Herringtons filed an application with the County for a 32-unit subdivision.[1] The application was accompanied by a tentative subdivision map prepared by a civil engineer, a project proposal containing a narrative description of the project, and a $600 filing fee. The project preserved 300 acres of open space, a 35-acre redwood grove, and 90 acres of agricultural land previously used to raise oat hay.
 
 
 6
 On June 6, 1979, the County planning staff found the Herrington proposal to be inconsistent with the General Plan because of its density, design, and conflict with resource preservation.
 
 
 7
 The Herringtons appealed the County planning staff's determination of inconsistency to the County Planning Commission. The Planning Commission heard the appeal on August 2, 1979. The planning staff presented a report at the hearing which, according to the Herringtons, contained several misrepresentations of fact and law. These alleged misrepresentations were: the property lacked water; a Citizen's Advisory Committee had reacted negatively to the proposal; the property had development limitations such as unstable soils; and the proposal conflicted with the pending West Sebastopol Specific Plan and was therefore unacceptable. The Planning Commission nevertheless reversed the staff determination and found the Herringtons' subdivision to be consistent with the General Plan.
 
 
 8
 Pursuant to County procedure, County Supervisor Eric Koenigshofer appealed the Planning Commission's consistency finding to the County Board of Supervisors. On November 13, 1979, the Board of Supervisors held a hearing. The planning staff again prepared an allegedly inaccurate report and presented it to the Board. The Board deferred decision of the appeal, and delegated to the County's Agricultural Technical Advisory Committee the task of evaluating the agricultural viability of the Herringtons' property and the impact of the Herrington proposal on the County's agricultural resources.
 
 
 9
 The Agricultural Committee held a meeting on November 28, 1979, without giving notice to the Herringtons. The Herringtons nonetheless attended the meeting, but were prohibited from speaking.[2] At the meeting, a County planning staff representative who supervised the Agricultural Committee distributed copies of the Herrington development proposal. These copies had been altered from the original document submitted by the Herringtons. The County states that the original document was merely edited because the Agricultural Committee was concerned only with those parts of the document which pertained to agricultural resources. The Herringtons contend that the alterations were a deliberate attempt to misrepresent the Herrington proposal. The Agricultural Committee voted five to two against the Herringtons' subdivision.
 
 
 10
 On December 11, 1979, the Board of Supervisors met to review the Herrington proposal. The Agricultural Committee submitted a memorandum to the Board which allegedly misrepresented that the Herrington property was agriculturally viable and that the land surrounding the property was agricultural rather than residential. In accordance with the Agricultural Committee's recommendation, the five-member Board voted unanimously to find the 32-unit subdivision proposal inconsistent with the General Plan. Specifically, the Board found the proposed density to be inconsistent with the preservation of agricultural and timber resources on the Herringtons' parcel.
 
 
 11
 During this period, the Board of Supervisors had been developing the West Sebastopol Specific Plan, which was intended to implement the policies of the General Plan. See Cal. Gov't Code Sec. 65450 (West 1987). Under California law, the specific plan must include text and diagrams which specify, inter alia: "[s]tandards and criteria by which development will proceed, and standards for the conservation, development, and utilization of natural resources, where applicable." Id. Sec. 65451(a)(3).
 
 
 12
 The Herringtons participated in preliminary hearings regarding the Specific Plan. At a meeting on March 4, 1980, the Board adopted the Specific Plan, which called for the preservation of agricultural and timber resources, and down-zoned the Herrington property to 100-acre minimum lot sizes. This downzoning restricted the Herrington property to a maximum of seven residential units. The Herringtons claim that they were not given an adequate opportunity to be heard regarding the downzoning, apparently because they were excluded from the March 4 meeting. The County states that no members of the public were allowed to attend this final meeting, because it was held solely for deliberation by the Board of Supervisors.
 
 
 13
 In June 1980, the Herringtons filed suit against the County pursuant to 42 U.S.C. Sec. 1983. At trial they asserted four claims against the County, and sought injunctive relief and monetary damages. First, the Herringtons contended that the County's determination that the 32-lot proposal was inconsistent with the General Plan, and the subsequent decision to downzone the Herrington property under the Specific Plan, had denied the Herringtons all economically viable use of their land because the land was unsuitable for agriculture. Thus, the Herringtons argued, the County's decisions effected a taking of their property without just compensation in violation of the Fifth Amendment.[3] Second, the Herringtons claimed that the County's decisionmaking process was conducted in violation of the Herringtons' procedural due process right under the Fourteenth Amendment. Specifically, the Herringtons alleged that they were not given adequate notice and an opportunity to be heard in regard to several of the County's decisions about their land. In addition, the County staff allegedly tampered with the evidence. Third, the Herringtons claimed that the inconsistency determination and the downzoning were irrational, arbitrary, and capricious because the decisions were unsupported by the evidence. Therefore, these decisions violated the Herringtons' substantive due process right under the Fourteenth Amendment. Fourth, the Herringtons argued that they had been deprived of equal protection of the law in violation of the Fourteenth Amendment. The equal protection claim derived from the County's approval, within two years after the inconsistency determination, of three major subdivisions on agricultural land. The Herringtons alleged that these properties shared identical physical characteristics with the Herrington property, and were governed by similar policies under the General Plan.
 
 
 14
 A ten-day jury trial was conducted in late 1985. After the evidence closed, the Herringtons abandoned their Fifth Amendment taking claim, and decided to pursue only their Fourteenth Amendment procedural due process, substantive due process, and equal protection claims.
 
 
 15
 The issue of the County's liability for constitutional violations was submitted to the jury on agreed instructions. The procedural due process instruction was: The "right to procedural due process includes the right to notice of any proceeding which will affect a final determination of plaintiffs' property rights and the opportunity to be heard and present objections in any such proceeding." The substantive due process instruction stated, inter alia: "If you find that the County's actions were arbitrary, unreasonable and capricious or capricious in regard to either rezoning plaintiffs' property or finding their proposed development inconsistent with the General Plan, then you must find that the defendant violated the plaintiffs' civil rights." The equal protection instruction was subsumed within the substantive due process instruction: "Similar pieces of property [may be treated] differently if the different treatment is ... not unreasonable, capricious or arbitrary."
 
 
 16
 The Herringtons' request for monetary damages was also submitted to the jury on agreed instructions. The damages instructions stated, inter alia: "The amount of your award shall include the following: First, any compensation due plaintiffs for loss of value of their property, second, in addition any compensation due plaintiffs for loss of profits that plaintiffs were prevented from earning by the actions of defendant, and third, compensation to plaintiffs for interest or return plaintiffs would have earned thereon."
 
 
 17
 The jury returned a general verdict for the Herringtons, and awarded damages of $2,500,600. Pursuant to a stipulation by the parties, the district court entered an order on September 10, 1986, declaring the County's inconsistency determination to be invalid. The General Plan and the Specific Plan were not affected by the judgment.
 
 
 18
 Following the jury verdict, the County moved to disqualify the trial judge, the Honorable Stanley A. Weigel, and vacate the proceedings, on the ground that Judge Weigel had owned property in Sonoma County and was biased in favor of the Herringtons. Judge Weigel denied the motion, but then recused himself from further proceedings in the case because of the developing antagonism between the judge and the County attorney. Judge Charles A. Legge was assigned to the remaining matters. The County moved for: a judgment notwithstanding the verdict on the ground that the Herringtons did not present sufficient evidence to support the jury's verdict; a new trial on the ground that Judge Weigel had been biased against the County; and a new trial on damages. The district court denied all three of these requests.
 
 
 19
 The County timely appeals the September 10, 1986, final judgment. The County raises six basic arguments on appeal: 1) the Herringtons' claims are not ripe; 2) the issue of the County's liability for constitutional violations should not have been submitted to the jury; 3) the County is entitled to a judgment notwithstanding the verdict due to lack of evidence; 4) the jury verdict constituted "plain error;" 5) the County is entitled to a new trial because Judge Weigel was biased against it; and 6) the award of damages is unfair and excessive. We reject all of these arguments, with the exception of the contention that the damages award cannot be allowed to stand. The Herringtons cross-appeal the district court's denial of prejudgment interest on the jury's damages award from the date of the jury verdict to the date of entry of judgment. Because we vacate the jury's damages award, we do not reach the merits of the Herringtons' cross-appeal.
 
 DISCUSSION
 A. Ripeness
 
 20
 The County contends that the Herringtons' claims are not ripe for adjudication. We note that the trial judge submitted the ripeness issue to the jury and that the jury implicitly found that the Herringtons' claims were ripe. However, the district court erred in submitting this issue to the jury; ripeness is a question of law which must be determined by the court. See Kinzli v. City of Santa Cruz, 818 F.2d 1449, 1453 n. 4 (9th Cir.1987). We review the ripeness issue de novo. Id.
 
 
 21
 In land use challenges, the doctrine of ripeness is intended to avoid premature adjudication or review of administrative action. It rests upon the idea that courts should not decide the impact of regulation until the full extent of the regulation has been finally fixed and the harm caused by it is measurable. The Supreme Court's most recent discussions of the doctrine of ripeness as applied to land use cases are contained in two taking cases: MacDonald, Sommer & Frates v. Yolo County, 477 U.S. 340, 106 S.Ct. 2561, 91 L.Ed.2d 285 (1986), and Williamson County Regional Planning Commission v. Hamilton Bank, 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985).
 
 1. Kinzli's Final Decision Requirement
 
 22
 In Kinzli, we interpreted Williamson and MacDonald to require a final decision by the government which inflicts a concrete harm upon the plaintiff landowner. Kinzli, 818 F.2d at 1454. We held that a final decision requires at least: "(1) a rejected development plan, and (2) a denial of a variance." Id. (citing Williamson, 473 U.S. at 187-90, 105 S.Ct. at 3117-19). The preliminary question for us is whether the Kinzli final decision requirement, derived from the Supreme Court's taking cases, applies to the due process and equal protection claims asserted by the Herringtons. We conclude that the requirement applies to the Herringtons' substantive due process and equal protection claims. We find it unnecessary to determine whether the final decision requirement also applies to the Herringtons' procedural due process claim.
 
 
 23
 In Kinzli, we held that a landowner's suit alleging a taking without just compensation, and violations of substantive due process and equal protection, was not ripe until the defendant had made a final determination regarding the application of its regulations to the subject property. Kinzli, 818 F.2d at 1455-56. The equal protection issue presented in Kinzli was whether the government's treatment of the landowner "bears no rational relationship to a legitimate government purpose." Kinzli, 818 F.2d at 1455 n. 7. This equal protection claim is similar to the substantive due process and equal protection claims asserted by the Herringtons.[4] Thus, we conclude that the Kinzli final decision requirement is applicable to the Herringtons' substantive due process and equal protection claims.
 
 
 24
 It is not clear whether the Herringtons' procedural due process claim is subject to the final decision requirement. In Norco Construction, Inc., v. King County, 801 F.2d 1143 (9th Cir.1986), we held that "claims for inverse taking, and for alleged related injuries from ... denial of [procedural] due process by unreasonable delay or failure to act under mandated time periods, are not matured claims until planning authorities and state review entities make a final determination on the status of the property." Norco, 801 F.2d at 1145 (emphasis added). We indicated that the final decision requirement was applicable to a procedural due process claim for unlawful delay in the processing of a development application because "[t]he duration of the wrongful taking may be relevant to determining whether a wrong has occurred, as well as the extent of the damage suffered." Id.
 
 
 25
 The Norco rationale does not appear to apply with equal force to the Herringtons' procedural due process claim. Norco is distinguishable from the case at hand because the Herringtons' procedural due process claim is not related to a taking claim. Norco is concerned with instances where a landowner claims that a procedural due process violation in the form of delay has contributed to a taking due to destruction of a property's beneficial use. See id. at 1145. In such cases, Norco requires a formal and final decision which effectively destroys beneficial use. In the instant case, because the Herringtons have withdrawn their taking claim, they do not rely on the argument that the County's alleged procedural due process violations constitute part of a decision to preclude all viable use of their property. Thus, it is not clear that the Herringtons should be required to wait until a "final decision" about their land has been made before challenging the decisionmaking process. However, we need not reach this issue, because we find that the Herringtons have satisfied the final decision requirement enunciated in Kinzli. We will assume that this requirement applies equally to the Herringtons' procedural due process, substantive due process, and equal protection claims.
 
 
 26
 As stated above, in Kinzli we held that a "final decision" requires at least: "(1) a rejected development plan, and (2) a denial of a variance." Kinzli, 818 F.2d at 1454 (citing Williamson, 473 U.S. at 187-90, 105 S.Ct. at 3117-19). We noted that a landowner may avoid the final decision requirement if attempts to comply with the requirement would be futile. Id. However, a property owner cannot rely on the futility exception until at least one meaningful application has been made. Id. at 1454-55. We found that the development application made by a developer in Kinzli was not meaningful because it had been "abandoned at an early stage in the application process." Id.[5] In the instant case, we conclude that the Herringtons have satisfied the Kinzli final decision requirement.
 
 
 27
 There is some controversy as to whether the Herringtons submitted even one development application to the County, and as to whether their proposed 32-lot subdivision was conclusively rejected. The County contends that the Herringtons' subdivision application was not complete because it did not contain an Environmental Impact Report ("EIR"). Instead of submitting an EIR, plaintiffs submitted a series of environmental studies. However, it is apparent from testimony by the County staff that submission of an EIR would have made no difference in the County's inconsistency determination. The County also characterizes the Board's inconsistency determination as a "preliminary" rather than a final decision. Nevertheless, it is clear that the 32-lot proposal was conclusively rejected when the inconsistency determination was made by the Board of Supervisors. Former County Planner Toby Ross testified that the Board's inconsistency determination constituted a final decision with respect to the Herringtons' proposed subdivision. He further testified that the only way for the Herringtons to obtain approval for their project, other than going to court, was to seek a General Plan amendment. The Herringtons, Ross stated, would have had no chance of obtaining a General Plan amendment. Michael Morrison, who was the County Subdivision Planner at the time of the Herringtons' application, gave similar testimony. Morrison stated that the Herringtons' only recourse after the inconsistency determination was to seek a General Plan amendment. He did not consider this to be a practical alternative.
 
 
 28
 This testimony demonstrates that the first Kinzli requirement--a rejected development plan--has been satisfied by the Herringtons. Although we do not believe that the Herringtons' development application was formally complete, we agree with the Herringtons' contention that the 32-lot development, as it was originally proposed, was definitively rejected by the County. Once the inconsistency determination was made, it would have been futile for the Herrington's to pursue their application for the 32-lot development. The fact that the Herringtons abandoned their application at a "preliminary" stage (i.e., after the inconsistency determination) does not affect our conclusion that a rejected development plan has been obtained in this case. The purpose of the Sonoma County consistency determination process is to enable a developer to determine at a preliminary stage whether to proceed with a particular development application. The County's determination of inconsistency effectively told the Herringtons to stop the application process in regard to the 32-lot proposal. Under the circumstances of this case it would be inappropriate to require the Herringtons to have formally completed a hopeless application.
 
 
 29
 The Herringtons did not apply for a variance. Nevertheless, the second Kinzli factor--application for a variance--need not be met in this case because the testimony at trial indicates that such an application would have been futile. The testimony states that the only means of obtaining approval of the 32-lot proposal after the inconsistency determination was through a General Plan amendment. This testimony finds support in Cal. Gov't Code Sec. 66474(a) (West 1983), which requires a county to reject a development proposal which is inconsistent with the general plan. Thus, section 66474(a) would appear to prohibit variances for inconsistent developments. Application for a variance was not a viable option for the Herringtons.
 
 
 30
 In sum, we hold that the Herringtons have satisfied the "final decision" ripeness requirement enunciated in Kinzli. The Herringtons' 32-lot development proposal was conclusively rejected by the County. Efforts to complete the development application, and application for a variance, would have been futile. In so holding, we emphasize that mere allegations by a property owner that it has done everything possible to obtain acceptance of a development proposal will not suffice to prove futility. See Williamson, 473 U.S. at 188, 105 S.Ct. at 3117; Kaiser Development Co. v. City and County of Honolulu, 649 F.Supp. 926, 942 (D.Haw.1986). Our holding is based upon repeated and uncontradicted testimony by County officials that the Herringtons' 32-lot proposal could not have obtained approval.
 
 2. MacDonald's Reapplication Requirement
 
 31
 However, our ripeness analysis cannot stop here. In MacDonald, the Supreme Court found that a landowner's taking claim may not be ripe even if a final decision has been made that the landowner's initial development proposal is unacceptable. MacDonald, 106 S.Ct. at 2568 & n. 8. Under MacDonald, a landowner must in certain circumstances obtain a decision as to the feasibility of less intensive development in order for a taking claim to ripen. Id. We conclude that the MacDonald reapplication requirement is not applicable to the Herringtons' due process and equal protection claims.
 
 
 32
 In MacDonald, the developer submitted a tentative subdivision map for 159 residential lots. The proposal was rejected by the Yolo County Board of Supervisors because it was not consistent with Yolo County's General Plan and Specific Plan. The developer brought suit, claiming that the County's rejection of the subdivision proposal had effected a taking because the land was not economically viable in its existing agricultural use. The Supreme Court held that the developer's taking claim was not ripe. The Court found that the developer had not received the county's " 'final definitive position regarding how it will apply the regulations to the particular land in question.' " Id. 106 S.Ct. at 2568 (quoting Williamson, 473 U.S. at 191, 105 S.Ct. at 3119). In concluding that the developer's claim was not ripe, the Court placed particular reliance on the fact that the County had denied only one specific proposal for intense residential development. There was no indication that all profitable development had been foreclosed. See id. 106 S.Ct. at 2568 & n. 8. The Court stated that "[r]ejection of exceedingly grandiose development plans does not logically imply that less ambitious plans will receive similarly unfavorable reviews." Id. 106 S.Ct. at 2569 n. 9. Thus, the Court concluded that the County had not made a final decision that denied all use of the property at issue and thereby effected a taking. Id., 106 S.Ct. at 2568-69. Implicitly, the Court suggested that landowners in such circumstances should submit an alternative development application in order to obtain a final decision pinpointing the impact of the applicable regulations.
 
 
 33
 This ripeness requirement of reapplication for alternatives has been employed in several taking cases. See, e.g., Pace Resources, Inc. v. Shrewsbury Township, 808 F.2d 1023, 1029 (3d Cir.), cert. denied, --- U.S. ----, 107 S.Ct. 2482, 96 L.Ed.2d 375 (1987); Kaiser, 649 F.Supp. at 942; Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency, 638 F.Supp. 126, 132-33 (D.Nev.1986). However, it has not to our knowledge been applied in cases where the property owner argues only that denial of a development proposal is arbitrary or irrational and therefore in violation of the developer's due process and equal protection rights.
 
 
 34
 We accept the County's argument that, although it rejected the Herringtons' 32-lot proposal, there is no indication that an alternative less intensive proposal would not have been allowed by the County. However, we hold that there is a fundamental difference between the taking claim at issue in MacDonald and the Herringtons' claims which precludes application to the instant case of the MacDonald reapplication requirement. We therefore conclude that the Herringtons' claims are ripe.
 
 
 35
 In order to succeed with a regulatory taking claim, a property owner ordinarily must demonstrate that all or substantially all economically viable use of the property has been denied. See First English Evangelical Lutheran Church v. County of Los Angeles, --- U.S. ----, 107 S.Ct. 2378, 2388, 96 L.Ed.2d 250 (1987); MacDonald, 106 S.Ct. at 2568-69; Pace Resources, 808 F.2d at 1031. A taking occurs when a regulation " 'goes too far.' " MacDonald, 106 S.Ct. at 2566 (quoting Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922)). A regulation goes too far when it "becomes so onerous that it has the same effect as an appropriation of the property through eminent domain or physical possession." Williamson, 473 U.S. at 199, 105 S.Ct. at 3124. In MacDonald, the developer contended that the County's denial of its subdivision proposal had precluded all viable use of the developer's land, and therefore sought compensation for inverse condemnation.[6] The claim was not ripe because the developer did not contend that only improvements pursuant to its original subdivision plan would avert a regulatory taking. MacDonald, 106 S.Ct. at 2568 n. 8. The Court declined to speculate whether less intensive development would have been permitted; rather, it required the developer to obtain a final decision as to whether profitable alternatives would be allowed by the government. See id., 106 S.Ct. at 2568-69.
 
 
 36
 In contrast, the Herringtons' due process and equal protection claims do not require proof that all use of their property has been denied. Unlike the developer in MacDonald, the Herringtons argue that the County necessarily had to approve their original development proposal (at the consistency determination stage) in order to avoid a constitutional violation. In challenging the County's inconsistency determination as arbitrary and capricious, the Herringtons do not require speculation as to what forms of less intensive development might have been permitted by the County. Such speculation is irrelevant to the issue of whether the inconsistency determination itself was arbitrary. Thus, the MacDonald reapplication requirement is not applicable here.[7]
 
 
 37
 Our decision that the MacDonald reapplication requirement does not apply here is not affected by the Supreme Court's indication in Williamson that similar ripeness standards applied to the property owner's claim in that case whether it was analyzed under the Just Compensation Clause of the Fifth Amendment or under the Due Process Clause of the Fourteenth Amendment. Williamson, 473 U.S. at 199-200, 105 S.Ct. at 3123-24. The landowner in Williamson alleged that all viable use of the property at issue had been denied. The Court phrased the Due Process Clause version of the plaintiff's claim as follows: "regulation that goes so far that it has the same effect as a taking by eminent domain is an invalid exercise of the police power, violative of the Due Process Clause of the Fourteenth Amendment." Williamson, 473 U.S. at 197, 105 S.Ct. at 3122.[8] This due process claim is premised on an assertion that all use of the claimant's property has been denied. See id. at 199, 105 S.Ct. at 3123; see also Ross v. City of Berkeley, 655 F.Supp. 820, 844 (N.D.Cal.1987) (interpreting Williamson ). Because the Herringtons' claims are not premised on such an assertion, Williamson does not require us to apply the identical ripeness standard for takings to the Herringtons' substantive due process, procedural due process and equal protection claims.[9]
 
 
 38
 To sum up, the Herringtons' claims meet the final decision requirement enunciated in Kinzli. The MacDonald reapplication requirement is inapplicable to this case because no taking by inverse condemnation has been alleged. The Herringtons' claims are ripe for adjudication.[10]
 
 B. Submission of Liability Issues to Jury
 
 39
 The issue of the County's liability for constitutional violations was submitted to the jury on agreed instructions. The County argues that the determination whether it violated the Herringtons' due process and equal protection rights was not for the jury to make because it involves issues of law. The County contends that the trial court should have determined if the legal standards for due process and equal protection were breached. We conclude that the County waived this argument.
 
 
 40
 Nowhere below did the County assert that the liability issues could not be submitted to a jury. It agreed without reservation to the submission of the issues to the jury on the instructions given, and thus cannot complain of the instructions on appeal. United States v. Kleifgen, 557 F.2d 1293, 1299 (9th Cir.1977) (contention that jury instruction improperly called for legal judgment could not be raised on appeal because of appellant's failure to object to instruction on this ground); see Lifshitz v. Walter Drake & Sons, Inc., 806 F.2d 1426, 1430-31 (9th Cir.1986); Gilchrist v. Jim Slemons Imports, Inc., 803 F.2d 1488, 1493 (9th Cir.1986). We therefore express no opinion as to the propriety of submitting the liability issues to the jury.
 
 
 41
 C. County's Motion for Judgment Notwithstanding the Verdict
 
 
 42
 The County challenges the sufficiency of the evidence produced to support the jury's liability verdict in favor of the Herringtons. The County argues that the district court incorrectly denied its motion for judgment notwithstanding the verdict ("JNOV"). We conclude that the County is precluded from obtaining a JNOV.
 
 
 43
 The County moved for a directed verdict at the close of the Herringtons' case, but failed to renew the motion at the close of all the evidence. Under Federal Rule of Civil Procedure 50(b), a motion for a directed verdict at the close of all the evidence is a prerequisite for a post-trial motion for JNOV. Farley Transportation Co. v. Santa Fe Trail Transportation Co., 786 F.2d 1342, 1346 (9th Cir.1986). The "requirement that the motion be made at the close of all the evidence is to be strictly observed." Id. This requirement may be avoided only where: 1) an earlier motion for a directed verdict has been taken under advisement by the trial judge, or 2) an ambiguous or inartful request or motion is made at the close of evidence which sufficiently approximates a motion for a directed verdict. Id. at 1346-47. These exceptions do not apply to the instant case. Our decisions subsequent to Farley have all followed the strict interpretation of Rule 50(b). See Johnson v. Armored Transport of California, Inc., 813 F.2d 1041, 1042-43 (9th Cir.1987); Lifshitz, 806 F.2d at 1428; Gilchrist, 803 F.2d at 1493. We decline to depart from this strict interpretation here.
 
 
 44
 Despite Farley, the district court entertained the County's motion for JNOV. The court found that the purpose behind Rule 50(b) was not implicated because there was no indication that the Herringtons had lost an opportunity to submit additional evidence. The court denied the motion on the merits, finding substantial evidence to support the jury verdict. The County argues that, for the reasons stated by the district court, we should consider its JNOV motion. We disagree. In Farley we explicitly rejected the reasoning of the district court in the case at hand. We adopted a strict application of Rule 50(b) in order to avoid "engag[ing] in a difficult and subjective case-by-case determination of whether a failure to renew a motion for directed verdict at the close of all the evidence has resulted in ... prejudice to the opposing party under the particular circumstances of that case." Farley, 786 F.2d at 1346. The County is precluded from challenging the sufficiency of the evidence.[11]
 
 
 45
 D. Existence of Evidence to Support Jury Verdict
 
 
 46
 Because the County is precluded from challenging the sufficiency of the evidence, our "inquiry is limited to whether there was any evidence to support the jury's verdict, irrespective of its sufficiency, or whether plain error was committed which, if not noticed, would result in a 'manifest miscarriage of justice.' " Shipman v. Central Gulf Lines, Inc., 709 F.2d 383, 386 (5th Cir.1983) (quoting Coughlin v. Capitol Cement Co., 571 F.2d 290, 297 (5th Cir.1978)). We review the jury's liability finding to determine "whether there is an 'absolute absence of evidence to support the jury's verdict.' " Shipman, 709 F.2d at 385 (quoting Coughlin v. Capitol Cement Co., 571 F.2d 290, 298 (5th Cir.1978)).[12] To uphold the general verdict, we must find that evidence was presented by the Herringtons in support of each and every theory of liability submitted to the jury. Cf. Syufy Enterprises v. American Multicinema, Inc., 793 F.2d 990, 1001 (9th Cir.1986) (where a general jury verdict is reviewed for sufficiency of the evidence, it ordinarily will be "upheld only if there is substantial evidence to support each and every theory of liability submitted to the jury"), cert. denied, --- U.S. ----, ----, 107 S.Ct. 876, 884, 93 L.Ed.2d 830, 838 (1987).
 
 
 47
 We have little difficulty in concluding that evidence was presented to support a finding of liability pursuant to the Herringtons' procedural due process claim. The Herringtons provided evidence that they were deprived of notice and an opportunity to be heard in regard to certain key decisions regarding their property. In addition, the Herringtons provided evidence that documents submitted to the County in support of their development application had been tampered with in order to present the proposal in an unfavorable light. Of course, the County's interpretation of these incidents differs from the Herringtons' interpretation. In particular, the County argues that the County cannot be held responsible for the misdeeds of staff employees. However, the County did not request a jury instruction distinguishing the acts of County staff from the acts of County officials. The jury found the County to be responsible for the misdeeds in question. We cannot conclude that the Herringtons' evidence provides no support to a verdict of procedural due process violations.
 
 
 48
 Findings of liability for substantive due process and equal protection violations come somewhat closer to the "plain error" border. In regard to substantive due process, while the Herringtons' development application for a 32-lot subdivision came within the General Plan's quantitative limitation of 35 lots, the General Plan also contained qualitative agricultural and environmental policies which the Herringtons conceded were legitimate. However, especially in light of the testimony regarding the County staff's misrepresentation of evidence, and the open space and resource preservation components of the Herringtons' proposal, we cannot conclude that there is an absolute absence of evidence that the County's inconsistency determination was irrational or arbitrary.
 
 
 49
 In regard to equal protection, the Herringtons showed that the County had approved sizable residential developments on three other agricultural properties shortly after it had rejected the Herrington proposal. While we are skeptical that there were no meaningful differences between these properties and the Herrington property, the Herringtons did supply evidence that no such differences existed.
 
 
 50
 In sum, under the extraordinarily deferential standard of review which we must apply to the jury's verdict, we conclude that the jury's liability determination must stand. In accordance with this conclusion, we affirm the district court's injunctive order invalidating the County's preliminary determination that the Herrington proposal was inconsistent with the General Plan.
 
 E. Trial Judge Bias
 
 51
 In addition to challenging the jury's liability determination, the County argues that it is entitled to a new trial because the trial judge was biased against it. We disagree.
 
 
 52
 After the trial of this case, the County discovered that Judge Weigel once owned land in Sonoma County which had been affected by the adoption of the General Plan in January 1978. The County moved to disqualify Judge Weigel. Judge Weigel denied the motion, but recused himself from further proceedings because of his developing animosity toward the County's attorney. After Judge Weigel recused himself, the County submitted a motion to the district court for a new trial on the ground that Judge Weigel was biased against the County, and should have disqualified himself from presiding over the trial. The district court denied this motion. We review Judge Weigel's failure to disqualify himself prior to trial for abuse of discretion. See United States v. Burt, 765 F.2d 1364, 1368 (9th Cir.1985).
 
 
 53
 Under 28 U.S.C. Sec. 455, a judge must disqualify himself, inter alia: 1) "in any proceeding in which his impartiality might reasonably be questioned," id. Sec. 455(a); 2) "[w]here he has a personal bias or prejudice concerning a party," id. Sec. 455(b)(1); or 3) where "[h]e knows that he ... has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding," id. Sec. 455(b)(4).[13]
 
 
 54
 Bias under 28 U.S.C. Sec. 455 must derive from extrajudicial sources. In re Beverly Hills Bancorp (Commercial Paper Holders v. R.W. Hine), 752 F.2d 1334, 1341 (9th Cir.1984). Section 455(a) covers circumstances that appear to create a conflict of interest, whether or not there is actual bias. Davis v. Xerox, 811 F.2d 1293, 1295 (9th Cir.1987). Section 455(b) covers situations in which an actual conflict of interest exists, even if there is no appearance of one. Id. Section 455(b) also describes situations that create an apparent conflict, because it provides examples of situations in which a judge's "impartiality might reasonably be questioned" pursuant to section 455(a). See United States v. Conforte, 624 F.2d 869, 880-81 (9th Cir.), cert. denied, 449 U.S. 1012, 101 S.Ct. 568, 66 L.Ed.2d 470 (1980).
 
 
 55
 Actual bias is a per se ground for disqualification. Davis, 811 F.2d at 1295. We have defined bias to consist of "an attitude or state of mind that belies an aversion or hostility of a kind or degree that a fair-minded person could not entirely set aside when judging certain persons or causes." Conforte, 624 F.2d at 881. The test for creation of apparent bias sufficient to require dismissal under sections 455(a) and 455(b) is an objective one: "whether a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned." United States v. Nelson, 718 F.2d 315, 321 (9th Cir.1983).[14]
 
 
 56
 The County's charge of bias stems from Judge Weigel's ownership of two tracts of land in Sonoma County. The judge purchased an 80-acre property in Alexander Valley in 1961. He purchased a 52-acre property in Bennett Valley in 1963. Both properties were sold in 1978. According to the County, Judge Weigel's ownership of this property caused bias in two respects: 1) the similar experiences of Judge Weigel and the Herringtons under the Sonoma County General Plan caused Judge Weigel to commiserate with the Herringtons during the course of the trial, and 2) Judge Weigel had a financial interest in the outcome of the trial because he holds a promissory note secured by the Bennett property.
 
 
 57
 At the outset, we find that, contrary to the County's allegation, the trial record itself does not indicate bias against the County. Judge Weigel was an active participant in the trial, but his participation was fair to both sides. The judge certainly exhibited animosity toward the County attorney during the hearing on the disqualification motion. However, personal bias, to require disqualification, must be against the party, not against counsel for the party. Cintron v. Union Pacific Railroad Co., 813 F.2d 917, 921 (9th Cir.1987). Moreover, Judge Weigel recused himself from further proceedings because of his developing animosity toward the County attorney. Because the courtroom proceedings in this case provide scant evidence of extrajudicial bias, we focus our analysis on whether the Judge Weigel's former ownership of land in Sonoma County created actual or apparent bias against the County.
 
 
 58
 The County's first argument is that the similarity between Judge Weigel's experiences with County land use regulation and the Herringtons' experiences indicates that Judge Weigel was biased against the County. The County alleges that this bias was evidenced by the judge's unfavorable treatment of the County throughout the trial.
 
 
 59
 Both of Judge Weigel's parcels were affected by the adoption of the County General Plan in 1978. In particular, the number of maximum allowable units on the two properties was radically reduced. The value of the properties was significantly reduced as a result. Judge Weigel hired an attorney in 1978 to investigate his property rights under the General Plan, but the judge never filed a development application. The Alexander property was apparently sold in 1978, after it had been downzoned. Judge Weigel also sold the Bennett property in 1978, and retained a security interest in it to secure a promissory note. The note, not in default, is apparently greatly oversecured.
 
 
 60
 We conclude that the restrictions placed by the County on the land formerly owned by Judge Weigel created neither actual nor apparent bias on the part of the judge. This case was tried in 1985--seven years after the judge sold his Sonoma County properties. Judge Weigel was never involved in adversary proceedings against the County. Judge Weigel had no experience with the procedures at issue in this case because he never filed a development application. He was simply one of many landowners whose property interests were affected by the adoption of the 1978 General Plan. Judge Weigel's experiences were not sufficiently similar to those of the Herringtons to indicate actual or apparent bias.[15]
 
 
 61
 The County's second argument is that Judge Weigel had a financial interest in the outcome of the suit. His alleged interest is his promissory note secured by the Bennett Valley property. The County charges that the outcome of this litigation could affect the value of the property securing the note.
 
 
 62
 Under 28 U.S.C. Sec. 455(b)(4), a judge must disqualify himself where "[h]e knows that he ... has a financial interest in the subject matter in controversy or in a party to the proceeding...." The statute defines "financial interest" as "ownership of a legal or equitable interest, however small...." Id. Sec. 455(d)(4). It is undisputed that even the slightest financial interest in the outcome of litigation requires disqualification. New York City Housing Development Corp. v. Hart, 796 F.2d 976, 980 (7th Cir.1986); Union Carbide Corp. v. U.S. Cutting Service, Inc., 782 F.2d 710, 714 (7th Cir.1986); In re City of Houston, 745 F.2d 925, 928 (5th Cir.1984); In re Cement Antitrust Litigation, 688 F.2d 1297, 1308 (9th Cir.1982), aff'd mem., 459 U.S. 1191, 103 S.Ct. 1173, 75 L.Ed.2d 425 (1983).
 
 
 63
 We conclude that Judge Weigel had no financial interest in the outcome of the Herrington lawsuit. Judge Weigel sold his property in Sonoma County long before the trial commenced. He does retain a security interest in the Bennett property, and the Bennett property is governed by the General Plan. But the Herringtons have not sought invalidation of the General Plan; they have sought only invalidation of the County's application of the General Plan to their property. Thus, the judgment of the jury will have no direct effect on the value of the Bennett property. At most, the judgment might affect the Bennett property by making the County more cautious about placing restrictions on land use. However, even if the judgment in this case could have such an indirect effect on the value of the Bennett Valley property, the value of Judge Weigel's promissory note, which is greatly oversecured, would not be affected. Judge Weigel's "connection" to the Herringtons' lawsuit due to his security interest in the Bennett Valley property is too remote, contingent, and speculative to constitute a financial interest in the case. See In re Placid Oil Co., 802 F.2d 783, 786-87 (5th Cir.1986). Nor did this remote relationship create an appearance of bias. See id. at 787.
 
 
 64
 We conclude that the County has not demonstrated that Judge Weigel should have disqualified himself prior to trial. We therefore affirm the district court's denial of the County's motion for a new trial on the ground of judicial bias.
 
 F. The Damages Award
 
 65
 The County argues that the jury's damages award is excessive and cumulative. It contends that, even if we uphold the jury's liability verdict, we should remand for a new trial on the issue of damages. The County did not object to the jury instructions on damages. Nevertheless, we conclude that the $2,500,600 damages award is so grossly excessive that it shocks the conscience. See Gilchrist, 803 F.2d at 1501; Hollins v. Powell, 773 F.2d 191, 197 (8th Cir.1985), cert. denied, 475 U.S. 1119, 106 S.Ct. 1635, 90 L.Ed.2d 181 (1986). We therefore vacate the award and remand the damages issue for a new trial.
 
 
 66
 The $2.5 million damages award is grossly excessive because it is well in excess of the value of the property, even with a development potential of approximately 32 units. Expert witness Charles Semple testified that the Herrington parcel was worth $1.3 million with a 32-lot development potential.[16] David Herrington valued the property at $1.5 million with such a potential. The $2.5 million award is excessive in light of these valuations because the Herringtons have not lost their property. Nor have the County's unlawful acts permanently deprived the Herringtons of any development potential to which the Herringtons were entitled: the County's inconsistency determination has been invalidated.[17] We cannot allow the Herringtons to keep their property and be compensated in an amount almost double the sale value of the property.
 
 
 67
 The Herringtons argue that the jury's award was reasonable. In support of this contention, the Herringtons state that the economic damage caused by the County's unlawful acts had three components: 1) permanent and irretrievable loss of value in the sum of $810,000; 2) lost potential profit in the sum of $910,000; and 3) loss of return on the lost value (calculated at the prevailing market rate of interest) in the sum of $800,000.[18] The total of these three components is $2,520,000. The components of damage alleged by the Herringtons do not alter our conviction that the damages award is grossly excessive. It is clear that these components are excessive or cumulative in at least three respects: 1) the valuation of each component is speculatively based on the assumption that the County could not legally have foreclosed development of approximately 32 units and on the assumption that the only alternative to the Herringtons' 32-lot proposal was no development at all; 2) because the Herringtons retain ownership of their land and because they have obtained invalidation of the inconsistency determination, the damage suffered is largely temporary rather than permanent; and 3) the awards for lost value and lost profits are duplicative.
 
 1. Speculativeness of the Award
 
 68
 The Herringtons claim damages for permanent lost value in the amount of $810, 000. This loss allegedly occurred in December 1979 when the Board of Supervisors made its inconsistency determination. The $810,000 figure is derived from expert testimony that the Herrington property is worth $1.3 million with the potential to construct a subdivision of approximately 32 units, and $490,000 with no development rights at all. The difference between $1.3 million and $490,000 is $810,000. We conclude that $810,000 is an excessive award for lost value because the $1.3 million dollar figure is too high and the $490,000 figure is too low.
 
 
 69
 The $1.3 million figure is too high because the Herringtons never had the "right" to construct a 32-unit subdivision. The Herringtons' apparent contention that the 32-lot proposal would eventually have been approved had it been found consistent with the General Plan is entirely speculative. A consistency determination is a preliminary determination which merely gives a developer the "green light" to proceed with its development application. As former County Subdivision Planner Michael Morrison testified, a finding that a proposed subdivision is consistent with the County's General Plan is no guarantee that a development proposal will ultimately be approved. The developer must still comply with, inter alia, the detailed requirements of Cal. Gov't Code Secs. 66410 et seq. (West 1983).[19] The County is not, and never has been, precluded from rejecting the Herringtons' 32-lot proposal, as long as that rejection is not irrational or arbitrary. The Herringtons obtained a verdict only that the County's inconsistency determination was unlawful, not that destruction of a 32-lot development potential would have been unlawful. The County cannot be required to compensate the Herringtons for the latter.
 
 
 70
 Moreover, the $490,000 estimate for the value of the property after the County made its inconsistency determination is too low. This estimate assumes that the County's rejection of the Herringtons' 32-lot subdivision unlawfully destroyed all hope for profitable use of the Herrington parcel. However, the Herringtons abandoned their taking claim, and cannot now argue that the County denied them all economically viable use of their land.[20] In sum, because the $1.3 million valuation is too high, and the $490,000 valuation too low, the $810,000 lost value component based on the difference of those two figures is excessive.
 
 
 71
 The $800,000 component for loss of return is based on investment of the alleged $810,000 lost value at a market rate, beginning in December 1979. Because the lost return component consists of interest on an exaggerated lost value component, it too is excessive.
 
 
 72
 The lost profit component is excessive for the same reason that the lost value component is excessive. The profit component is based on the assumption that the Herringtons were entitled to approval of a development of approximately 32 units and on the assumption that the only alternative to the 32-lot proposal was no development at all. As we explained above, both of these assumptions are wholly speculative.[21]
 
 2. Temporary rather than Permanent Harm
 
 73
 Because the Herringtons retain ownership of their land, and because the inconsistency determination has been declared invalid, at least part of the lost value component is entirely superfluous. Even if we assume that the County unlawfully caused a decrease in the value of the Herrington property in the amount of $810,000, the loss was temporary, not permanent.[22] Because the Herringtons retain their property, they have, at best, suffered delay in receiving the $810,000. That delay is fully compensated by awarding interest (i.e., loss of return) for delay in receipt of the lost value. We acknowledge that expert witness Charles Semple testified that a portion of the lost value (perhaps half) was irretrievable because, inter alia, the costs for developing streets and utilities have risen since 1980. At this stage, we do not preclude the Herringtons from claiming damages for this form of irretrievable lost value.
 
 
 74
 As with the lost value figure, the lost profit figure does not adequately take into account that the Herringtons' alleged potential profit has been delayed, not permanently lost. Even if we assume that the $910,000 lost profit component is accurate, the expert testimony indicates that at least one fourth of that amount could be recaptured if construction of residential development began now.3. Cumulativeness of the Award
 
 
 75
 Finally, we agree with the County that the damages award is cumulative. The $810,000 loss of value component compensates the Herringtons for loss of the alleged development potential of their property. In other words, had the Herringtons established a right to a development potential of approximately 32 lots, the County would have had to pay $810,000 to take that development potential from them and preclude them from making any economically viable use of their property. The $915,000 lost profit component constitutes a double recovery for the loss of the alleged development potential because the valuation of this potential is based in part on expected profit, which is foregone by the seller upon sale of the development right. Had the Herringtons sold the right to develop the property, they would not have actually received profits from the development. Therefore, the Herringtons cannot obtain compensation for both lost value and lost profit. Nor can they obtain compensation for loss of return on both delayed sale value and delayed profit.
 
 4. Conclusion
 
 76
 In conclusion, because the Herringtons retain their property, and have obtained a judgment invalidating the County's inconsistency determination, the harm caused by the County's unconstitutional acts derives primarily from delay in the proper consideration of the Herringtons' subdivision application. We express no opinion as to whether any of the three components of damage asserted by the Herringtons are appropriate in this case.[23] We only hold that, for the reasons stated above, these components are excessive and cumulative. We cannot allow the $2.5 million jury award to stand. We therefore vacate the damages award, and remand the case for a new trial on damages.
 
 G. Prejudgment Interest
 
 77
 The Herringtons argue that the district court erred in denying prejudgment interest on the jury award from the date of verdict to the date of entry of judgment. We need not reach this issue because of our decision to vacate the jury's award of damages.
 
 CONCLUSION
 
 78
 The Herringtons' procedural due process, substantive due process, and equal protection claims are ripe. The County's failure to object to the jury instructions below precludes it from appealing the submission of the issue of the County's liability to the jury, and from objecting to the substance of those instructions. The County is also precluded from challenging the sufficiency of the Herringtons' evidence through a motion for judgment notwithstanding the verdict. We find that there was not an absolute absence of evidence to support the jury's findings of liability in regard to the Herringtons' due process and equal protection claims. Thus, we AFFIRM the district court's injunctive order invalidating the County's inconsistency determination. But the jury's award of damages is so grossly excessive as to shock the conscience. We therefore VACATE that portion of the judgment awarding damages and REMAND the case to the district court for a new trial on damages.
 
 
 79
 The Herringtons' request for attorney's fees on this appeal pursuant to 42 U.S.C. Sec. 1988 is denied.
 
 TANG, Circuit Judge, dissenting:
 
 80
 I respectfully dissent. While I agree at a minimum with the decision to remand the case for a new trial on damages because excessive, I think it more logical to hold that the Herringtons' claims are simply not ripe for review and should have been dismissed by the district court. The Herringtons assert violations of their rights to procedural and substantive due process and to equal protection. As the majority points out, the only injury derives from delay in consideration of the Herringtons' subdivision application. Slip op. at 41. The majority's opinion highlights the difficulty of assessing the damages caused by such a due process violation when it says "we know neither the proper length of that delay nor the 'highest and best permissible use.' " Id. at n. 23. The suggestion of the necessity for a surrogate measure to calculate unknown damages indicates to me that in reality a case in this posture is not ripe for review.
 
 
 81
 The majority holds that the Herringtons met the "final decision" ripeness requirement enunciated in Kinzli v. City of Santa Cruz, 818 F.2d 1449 (9th Cir.1987), a regulatory taking case. The fact that application of the Kinzli factors to this case leads to a finding that the factors are satisfied suggests that Kinzli offers an inadequate measure of ripeness in a case involving only claims of due process and equal protection violations. I agree that the Herringtons' proposed subdivision was rejected and that it would have been futile for them to seek a variance, but I do not think this satisfies the essence of the "final decision" requirement for ripeness.
 
 
 82
 In taking and due process cases, the ripeness requirement is intended to assure that courts can make an accurate determination of the precise economic impact of zoning regulations. That determination cannot be made until "the administrative agency has arrived at a final, definitive position regarding how it will apply the regulations at issue to the particular land in question." Williamson County Regional Planning Comm'n v. Hamilton Bank, 473 U.S. 172, 191, 105 S.Ct. 3108, 3119, 87 L.Ed.2d 126 (1985). The Herringtons' claims are not based on a denial of all use, but on an arbitrary and discriminatory denial of the use they proposed. The County's rejection of their development plan may have been a final decision about the proposed subdivision, but it was not a final, definitive statement of how the County would apply the general plan to the Herringtons' land.
 
 
 83
 The difficulty with treating such claims as ripe for review before the County has finally determined the use it will allow is that damages are not calculable. An excessive jury verdict in such a case is hardly surprising. Any verdict based upon sheer speculation about the amount of damages is prone to be excessive because it is not constrained by any appropriate measure of actual damages. The solution suggested by the majority that on remand a surrogate measure of damages may be employed is a possible solution to the difficulties posed by this case. A better solution would have been to avoid the problem by dismissing the case as not yet ripe for review.
 
 
 
 [1]
 The County contends that this application sought only a preliminary finding of consistency with the General Plan, and did not meet the requisites of a formal subdivision application. A formal subdivision application must be accompanied by an environmental impact report. Although the Herringtons submitted environmental "studies" with their application, they did not prepare an environmental impact report
 
 
 [2]
 The Agricultural Committee had made a field inspection of the Herrington property with the developers on November 26
 
 
 [3]
 The Just Compensation Clause of the Fifth Amendment states: "[N]or shall private property be taken for public use, without just compensation." This restriction is applied to the states through the Due Process Clause of the Fourteenth Amendment. Williamson County Regional Planning Commission v. Hamilton Bank, 473 U.S. 172, 175 n. 1, 105 S.Ct. 3108, 3111 n. 1, 87 L.Ed.2d 126 (1985)
 
 
 [4]
 Scrutiny under ordinary equal protection analysis is essentially equivalent to scrutiny under substantive due process doctrine. Construction Industry Association v. City of Petaluma, 522 F.2d 897, 906 n. 11 (9th Cir.1975), cert. denied, 424 U.S. 934, 96 S.Ct. 1148, 47 L.Ed.2d 342 (1976)
 
 
 [5]
 The Kinzlis had attempted to sell their property under contracts conditioned upon receipt from the City of Santa Cruz of permission for residential development. One potential purchaser filed a development application on behalf of the Kinzlis. "However, he did not pursue the application once he was told by a staff engineer ... that the City could not provide water services to the property." Kinzli, 818 F.2d at 1452
 
 
 [6]
 "Inverse condemnation" has been defined as "a cause of action against a governmental defendant to recover the value of property which has been taken in fact by the governmental defendant, even though no formal exercise of the power of eminent domain has been attempted by the taking agency." United States v. Clarke, 445 U.S. 253, 257, 100 S.Ct. 1127, 1130, 63 L.Ed.2d 373 (1980) (citation and emphasis omitted)
 
 
 [7]
 We do not believe that this holding will undercut the strict ripeness standard for taking cases set forth in MacDonald. That is, we do not believe that developers will simply rely on substantive due process claims in order to avoid the MacDonald ripeness test for takings. Taking claims and substantive due process claims are not fungible. We note at least three major distinctions between the two approaches
 First, both taking claims and substantive due process claims may involve an assessment of whether the contested action was a reasonable and proper exercise of the police power. However, the test for reasonableness under taking doctrine is arguably less deferential to the government's decision-making authority than the test for reasonableness under substantive due process. Compare Agins v. City of Tiburon, 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980) (taking case: regulation must "substantially advance legitimate state interests") (emphasis added); Hall v. City of Santa Barbara, 813 F.2d 198, 207 & n. 25 (9th Cir.1987) with Minnesota v. Clover Leaf Creamery Co., 449 U.S. 456, 466, 101 S.Ct. 715, 725, 66 L.Ed.2d 659 (1980) (equal protection clause is satisfied if government "could rationally have decided" that the measure adopted might achieve the government's objective) (emphasis in original); Ross v. City of Berkeley, 655 F.Supp. 820, 842 (N.D.Cal.1987) (substantive due process violation occurs when zoning measure has "no rational relation" to its objective). We acknowledge that the Agins reasonableness test quoted above is derived from an older substantive due process case. See Agins, 447 U.S. at 260, 100 S.Ct. at 2141 (citing Nectow v. City of Cambridge, 277 U.S. 183, 188, 48 S.Ct. 447, 448, 72 L.Ed. 842 (1928)). Nevertheless, the Supreme Court has suggested that the Agins taking test is less deferent than the current substantive due process test. Nollan v. California Coastal Commission, --- U.S. ----, 107 S.Ct. 3141, 3147 n. 3, 97 L.Ed.2d 677 (1987).
 Second, even if the government's action is a legitimate exercise of the police power, it is not insulated from a taking challenge. Proof that a regulatory decision "goes too far" does not require a showing that the decision is arbitrary or irrational. See Nollan, 107 S.Ct. at 3155 (Brennan, J., dissenting); Williamson, 473 U.S. at 199, 105 S.Ct. at 3123; Pace Resources, 808 F.2d at 1030. In contrast, to prove that a zoning decision violates substantive due process, the property owner must show that the government "could have had no legitimate reason for its decision." Shelton v. City of College Station, 780 F.2d 475, 483 (5th Cir.1986), cert. denied, --- U.S. ----, 106 S.Ct. 3276, 91 L.Ed.2d 566; --- U.S. ----, 107 S.Ct. 89, 93 L.Ed.2d 41 (1986). The burden on a landowner to prove that a land use decision is arbitrary or irrational is an extraordinarily heavy one. See Pace Resources, 808 F.2d at 1035; Shelton, 780 F.2d at 483; Construction Industry Association v. City of Petaluma, 522 F.2d 897, 905-08 (9th Cir.1975), cert. denied, 424 U.S. 934, 96 S.Ct. 1148, 47 L.Ed.2d 342 (1976).
 Third, the appropriate damages award may be lower under a substantive due process claim than under a taking claim for inverse condemnation, because the property owner may not be able to obtain compensation for denial of all use of the property during the period of the violation.
 
 
 [8]
 The Supreme Court declined to determine whether this form of due process claim was valid. Williamson, 473 U.S. at 199, 105 S.Ct. at 3123
 
 
 [9]
 Indeed, the Court expressly stated that the plaintiff's substantive due process, procedural due process, and equal protection claims were not at issue. Williamson, 473 U.S. at 182 n. 4, 105 S.Ct. at 3114 n. 4
 
 
 [10]
 Williamson also holds that a taking claim in federal court is not ripe until the plaintiff has sought "just compensation" from state entities. Williamson, 473 U.S. at 194-97, 105 S.Ct. at 3121-22. This requirement does not apply to the due process and equal protection claims at issue here. See Cassettari v. County of Nevada, 824 F.2d 735, 738 (9th Cir.1987)
 
 
 [11]
 We may review the sufficiency of evidence despite failure to move for a directed verdict at the close of the evidence where "there is such plain error apparent on the face of the record that failure to review 'would result in a manifest miscarriage of justice.' " Williams v. Hughes Helicopters, Inc., 806 F.2d 1387, 1392 (9th Cir.1986) (quoting United States v. 33.5 Acres of Land, 789 F.2d 1396, 1400 (9th Cir.1986)). We find no such plain error here
 
 
 [12]
 The County is precluded from challenging the substance of the liability instructions, even if "plain error" was present, because it made no objections to these instructions at trial. Brocklesby v. United States, 767 F.2d 1288, 1293 (9th Cir.1985), cert. denied, 474 U.S. 1101, 106 S.Ct. 882, 88 L.Ed.2d 918, (1986); Pierce Packing Co. v. John Morrell & Co., 633 F.2d 1362, 1365 (9th Cir.1980); Calhoun v. United States, 591 F.2d 1243, 1246 (9th Cir.1978), cert. denied, 439 U.S. 1118, 99 S.Ct. 1025, 59 L.Ed.2d 77 (1979); Moore v. Teflon Communications Corp., 589 F.2d 959, 966 (9th Cir.1978); Bock v. United States, 375 F.2d 479, 480 (9th Cir.1967). We express no opinion as to the validity of these instructions
 
 
 [13]
 Recusal is required under 28 U.S.C. Sec. 144 whenever a judge has a "personal bias or prejudice" concerning a party. We apply the same test for bias under both 28 U.S.C. Sec. 455 and 28 U.S.C. Sec. 144. In re Beverly Hills Bancorp (Commercial Paper Holders v. R.W. Hine), 752 F.2d 1334, 1341 (9th Cir.1984)
 
 
 [14]
 We note it has been held that, after a trial is over, a party is not entitled to a new trial where only the appearance of bias exists. United States v. Murphy, 768 F.2d 1518, 1541 (7th Cir.1985). We need not reach this issue because we find no appearance of bias in this case
 
 
 [15]
 The County has brought to our attention a newspaper editorial from the "Santa Rosa Press-Democrat" dated January 2, 1986. The editorial states, inter alia: "If the county's representations about the judge's property holdings are correct, Judge Weigel should have disqualified himself, or at the least, disclosed his holdings before the trial began and given Sonoma County officials the opportunity to decide whether a motion for disqualification was necessary." Although the editorial is not irrelevant, the "mere sound of controversy" does not automatically create an appearance of judicial bias. In re United States, 666 F.2d 690, 695 (1st Cir.1981)
 
 
 [16]
 In calculating the losses suffered by the Herringtons, the expert purportedly did not rely directly on the value of a 32-unit development. However, it is apparent from the expert's testimony that he had this figure in mind when he made his calculations. In addition, the $1.3 million figure is roughly in accord with David Herrington's testimony that the property was worth $1.5 million with a 32-lot development potential
 
 
 [17]
 We also note that $2.5 million greatly exceeds the money damages requested by the Herringtons at trial. At trial, counsel for the Herringtons stated that $2.5 million was the "maximum claim ... if no other relief were available...." The context of this statement indicates that by "no other relief available," counsel meant no injunctive relief. The Herringtons obtained injunctive relief in the form of invalidation of the County's inconsistency determination. Moreover, at the closing argument, the Herringtons, in addition to requesting invalidation of the County's inconsistency determination, asked for a verdict "somewhere between a million five and a million seven ... to make the Herringtons whole."
 
 
 [18]
 Although the Herringtons' brief does not make it clear, it appears from the expert testimony of Charles Semple that this lost return component is based solely on lost value, and not on lost profit. The lost profit component itself apparently includes loss of return on the profit
 
 
 [19]
 For example, in addition to requiring a county to reject a development proposal which is inconsistent with the general plan, Cal. Gov't Code Sec. 66474 (West 1983) lists six other circumstances which require a county to deny approval of a tentative subdivision map
 
 
 [20]
 See our discussion of ripeness, supra
 
 
 [21]
 We express no opinion about the appropriateness of awarding any lost profits to the Herringtons. We note, however, that in taking cases, damages for lost profits are generally considered excessively speculative. See, e.g., A.G. Davis Ice Co. v. United States, 362 F.2d 934, 936-37 (1st Cir.1966); Sixth Camden Corp. v. Township of Evesham, 420 F.Supp. 709, 729 (D.N.J.1976); Hedstrom Lumber Co. v. United States, 7 Cl.Ct. 16, 27-29 (1984); Foster v. United States, 2 Cl.Ct. 426, 445-46 (1983); Kearney Trecker Corp. v. United States, 688 F.2d 780, 783-84 (Cl.Ct.1982). But cf. Scott v. Greenville County, 716 F.2d 1409, 1424 (4th Cir.1983) (claim for lost profits due to alleged substantive due process violation survived motion for summary judgment). Suffice it to say that the Herringtons' allegation of lost profits does not affect our conviction that the jury award was grossly excessive
 
 
 [22]
 In characterizing the Herringtons' lost value as temporary rather than permanent, we are assuming that, in accordance with the expert testimony, the relevant land values have not changed significantly since the County made its inconsistency determination
 
 
 [23]
 The only injury has been to delay the utilization by Herrington of the property in its highest and best permissible use
 On the present record we know neither the proper length of that delay nor the "highest and best permissible use." The two unknowns are related; only by ascertaining the latter can the former be approximated. Moreover, it is possible that some of the actual delay in development is due to the failure of Herrrington to mitigate damages. These deficiencies in the record are enough to justify the rejection of the $2,500,600.00 award. However, they also suggest that the trial court may well be at sea in its attempt to fix damages. How is it to determine what is the property's "best permissible use" and at what point in time that utilization will, or would have, become possible? It is likely the district court will seek out a surrogate measure of damages.
 One such measure would be the difference between the value of the property immediately before the County's inconsistency determination and its value immediately after that determination. A fully informed buyer after the County's inconsistency determination, in fixing the price he would be prepared to bid, would attempt to estimate what level of development he was likely to be permitted by the County. Of course, such a buyer would like to purchase the property on the assumption that no development would be permitted. The owner very likely would be unwilling to sell a such a figure, which in this case appears to be $490,000.00.
 On the other hand, a buyer immediately before the inconsistency determination is not likely to pay a price measured by assuming approximately 32 units would be authorized. He would know there is a risk that many fewer units would be authorized and his bid price would be lowered to account for this possibility. Thus, such a buyer would not be likely to pay $1.3 million.
 This suggests that should this surrogate measure be employed recoverable damages should be somewhat less than $810,000.00. The possible availability of prejudgment interest presents an issue the trial court should explore. The present record discourages any effort to express an opinion on the issue at this time.
 No doubt other approaches to the measurement of damages will emerge in the hearings on remand.