**LONG GROVE COUNTRY CLUB ESTATES, INC., et al., Plaintiffs,**

v.

**The VILLAGE OF LONG GROVE, et al., Defendants.**

**No. 82 C 6868.**

United States District Court, N.D. Illinois, E.D.

July 1, 1988.

seek. *See* Petition for Fees, Costs and Double Interest at 2; Affidavit of Jeff McClellan at 2.

Matthias A. Lydon, Pierce, Lydon, Griffin & Montana, John A. Dienner, III, Chicago, Ill., for plaintiffs.

Alan O. Amos, Stephen E. Sward, Rooks, Pitts, Fullagar & Poust, Chicago, Ill., Gregory G. Lawton, Sarah Hansen Sotos, Judge & Knight, Ltd., Park Ridge, Ill., George B. Collins, Collins & Amos, Richard M. Carbonara, Asst. Atty. Gen., Michael I. Miller,

Michael J. Gill, Isham, Lincoln & Beale, Robert Marc Chemers, Pretzel & Stouffer, Chtd., Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

HOLDERMAN, District Judge:

Before the court is plaintiffs' motion for reconsideration of its February 27, 1987 decision to grant defendants' motion for summary judgment. Since the entry of that order plaintiffs have brought certain facts to this court's attention. Additionally, on October 26, 1987, the Circuit Court of Lake County reached a decision in related litigation. (Nos. 77 MR 176 and 80 L 430). Consequently, this court has reconsidered its February 27, 1987 decision and again grants defendants' motions for summary judgment.

Certain Long Grove ordinances are relevant. Subdivision Control Ordinance # 7, last amended in November 1957, provides that: (1) subdivisions and improvements must conform to the regulations set forth "hereinafter"; (2) because of the topographical condition of the area, "special considerations shall be given to the natural storm water drainage and sewer disposal systems. The Plan Commission shall request additional proof for the said sewer and drainage facilities, preventing floods, overflows, or retarded drainage;" (3) "lots abutting upon a water course ... shall have an additional depth or width as required to provide an acceptable building site"; (4) no building permit shall issue until a copy of the subdivision plat, bearing the approval of the Village Mayor, Village Plan Commission and Village Counsel, is recorded.

On June 11, 1964 the Village Board adopted the Subdivision Control Ordinance ("the 1964 Regulations"). The 1964 Regulations apply to "all subdivisions made within ... Long Grove" subsequent to June 11, 1964.

One of the purposes set forth in the Regulations is "to safeguard the public against flood damage." Article III of the Regulations sets forth the Village's plat procedure, including provisions that: (1) the final subdivision plat shall be recorded with the Lake County Recorder after approval by the Village President and Plat Officer; (2) recording of the final plat "authorizes" the issuance of building permits but does not constitute acceptance of dedications; (3) the subdivider shall pay certain fees to the Village; (4) building permits shall not issue until the Plat Officer notifies the Zoning Officer that the final plat has been approved and recorded; and (5) certificates of occupancy shall not issue until the Plat Officer notifies the Zoning Officer that the required improvements have been completed and approved.

Article V of the Regulations sets forth design standards, including provisions that: (1) each subdivision shall be appropriate to the topography, the drainage and other natural features of the site; (2) land subject to flooding shall not be platted for residential occupancy nor for any use which may aggravate the flood hazard; such land shall be set aside for uses which will not be endangered by flooding and will not reduce the capacity of the flood plain; (3) when a subdivision is traversed by a water course or stream "there shall be provided a storm water easement or drainage right-of-way conforming substantially with the lines of such water course and such further width or construction as will be adequate for proper drainage."

Article VI of the Regulations provides for improvements, including streets, culverts and bridges. Article VI(E)(3) states that (1) "adequate drainage structures shall be provided;" (2) all improvements shall be inspected at the subdivider's expense; and (3) the subdivider shall pay to the Village fees to defray inspection and engineering services.

Article VII of the Regulations provides engineering specifications. Article VII(c)(1) provides specifications for culverts, including minimum length, minimum diameter, and preferred material. Article VII(c)(2) provides that "all bridges and culverts having a span of more than ten feet shall be approved by the Bridge Engineer,

Department of Public Works and Buildings, State of Illinois."

Article VII of the Regulations provides for dedications. Article VII provides that all new streets shown on a plat shall be dedicated outright to the public. The "public agency," however, can refuse any dedication.

Article IX of the Regulations allows for modifications and appeals. Under Article IX, the Planning Commission, under certain conditions, may vary the terms of the Regulations. Article IX(D) provides that any person aggrieved by a decision by the Plat Commission can request a hearing before the Village Board. The Village President shall schedule a hearing within 30 days of such a hearing request.

On May 24, 1977 the Village adopted Ordinance 77-0-8. Ordinance 77-0-8 became effective on May 24, 1977. It applies to all building permit applicants. Ordinance 77-0-8 provides that, as a condition to receipt of a building permit, an applicant must (1) donate various sums to certain local funds, *e.g.* local school district funds and the Village's general fund and (2) follow a new fee schedule.[1]

On October 9, 1979 the Village amended Ordinance 77-0-8 ("the Amendments") to require that an applicant complete subdivision improvements or post a bond for completion of these improvements before receiving a building permit.

## BACKGROUND FACTS

The parties agree on the following facts. Robert Anderson is President and sole shareholder of Long Grove Country Club Estates, Inc. ("LGCCE"). Defendants are the Village of Long Grove ("Village"), past and present Village Trustees, the Village Attorney John Mullen, the past and present Village Presidents George Dixon and Robert Coffin, Village Engineer John Bleck,

and Illinois Department of Transportation employee Karen Kabbes.

LGCCE acquired, subdivided and sold land in Long Grove, Illinois. 22 sites in the LGCCE subdivision are located in Unit 7. In 1962 LGCCE recorded a plat of the LGCCE subdivision. In March 1965 LGCCE recorded a plat of Unit 7. Before this plat was recorded, the Village of Long Grove Board of Trustees ("the Board") approved it.

### 1. Culvert Construction Facts

On August 10, 1978, the Illinois Department of Transportation's Division of Water Resources received LGCCE's application, under Ill.Rev.Stat. ch. 19 § 70, for a permit to build two culverts over Buffalo Creek. LGCCE's only access to Unit 7 was by these proposed culverts.

On September 5, 1978 Karen Kabbes, a civil engineer with the Illinois Department of Transportation ("IDOT") wrote to LGCCE's engineer stating that the proposed culverts would cause an excessive amount of backwater.

Ms. Kabbes noted that LGCCE's application did not consider outlet control conditions. She directed the LGCCE engineer to redesign the culverts so as "to meet created head criteria, taking into account the additional losses."

On September 29, 1978 the Division of Water Resources received revised culvert plans. Ms. Kabbes noted the following deficiencies: (1) the calculations did not use the correct "TW" depth; (2) the calculations did not show how "H" was derived and had an incorrect "H" value; (3) the plans did not show the double 8x8 box culvert details, headwall details and proposed culvert inverts.

On October 2, 1978 Ms. Kabbes called the LGCCE engineer, informed him of the

---

**1.** In their initial state court complaint plaintiffs challenged the application of Ordinance 77-0-8 to LGCCE. The AJO provided that Ordinance 77-0-8 did not apply to units platted in LGCCE prior to 1977. The Circuit Court of Lake County on August 25, 1980, in ruling on the petition and the counterpetition to enforce the AJO, held that the 1964 Regulations (not Ordinance 77-0-

8) were invalid. The Illinois Appellate Court, in its August 9, 1983 decision, held that the 1964 Regulations were in fact valid. As far as this court can discern, there have been no other judicial decisions involving the Subdivision Control Ordinance # 7, the 1964 Regulations, or Ordinance 77-0-8.

deficiencies and requested corrected plans. (PX 5, attached to Plaintiffs' Motion for Partial Summary Judgment).

On October 10, 1978 the Department of Water Resources received another set of revised plans. Ms. Kabbes noted that the plans and calculations were inconsistent, the plans showing one culvert as 35 feet long with a .57% slope and the other culvert as 50 feet long with a .60% slope. The calculations, however, assumed both culverts to be 50 feet at .5% slope. According to Ms. Kabbes' uncontradicted affidavit, on November 9, 1978 she called the LGCCE engineer and informed him of these new deficiencies. He stated that the plans were wrong and promised to send new plans.

Prior to 1978, IDOT generally issued a public notice only after IDOT had approved an applicant's plans for construction. In 1978, however, because of increasing delays in IDOT approval, IDOT began issuing public notices before it had actually approved construction plans.

In the present case, Mr. Anderson told Ms. Kabbes that he was really behind and "wanted to push the permit," so after a quick review of the new calculations, on November 16, 1978, Ms. Kabbes issued a public notice. The notice described the proposed culverts and invited public comment.

On November 29, 1978 the Village Administrator, D.M. Doughty, wrote a memo to the Village Engineer, Jack Bleck. The memo directed Mr. Bleck to work with the Village Attorney, Mr. Mullen, to prepare a letter on the proposed culvert permit. Mr. Doughty told Mr. Bleck to discuss four particular items: (1) the wisdom of two culverts; (2) the possibility that Buffalo Creek would parallel the dedicated roadway for 150 feet; (3) the fact that the culvert crossing would run on a publicly dedicated roadway, so that the Village should sign the culvert permit; (4) a request that IDOT delay its decision so that the Village could review the culvert design.

On December 5, 1978 Mr. Bleck wrote Mr. Mullen and set forth his recommendations as to the proposed culvert. Mr. Bleck recommended that: (1) a single, larger structure be used to reduce the probability of backwater; (2) the culvert be placed and stream channel be realigned so that the creek would not parallel the dedicated roadway; (3) the Village, as owner of the public right-of-way on which the culvert would be constructed, sign the culvert application; (4) the Village get plans for the twin 8x8 culverts; (5) LGCCE provide easements for purposes of construction on six lots; (6) the culverts have a .20% slope with upstream inverts of 701.20 M.S.L. 1929 adj., 700.80 M.S.L. 1929 adj.; (7) LGCCE provide riprap and end sections for the upstream and downstream ends of the culverts; (8) the culverts be long enough to provide slopes no greater than 2.5:1 and an 8-foot shoulder on each side; (9) the back slopes/road fill be sodded; (10) the roadway crossing have guard rails at least eight feet from the pavement; and (11) the roadway be at least three feet above the top of the culvert structure.

On December 5, 1978 Mr. Mullen wrote to IDOT and reiterated Mr. Bleck's comments.

On January 11, 1979 IDOT representative Frank Rupp III wrote LGCCE and enclosed Mr. Mullen's December 5, 1978 letter. Mr. Rupp wrote that IDOT would hold the permit application in abeyance to give LGCCE and the Village a chance to resolve their differences. Mr. Rupp suggested that LGCCE contact the Village in order to reach agreement. Mr. Rupp also wrote that, if the Village and LGCCE could not reach an agreement, LGCCE should give IDOT its opinion of the validity of the Village's objections, and IDOT would then make a final decision on the permit application. This was in accordance with IDOT's policy of not issuing a permit until either (1) the applicant and the objector resolved their differences or (2) IDOT determined that the objections were without merit.

On January 23, 1979 the Board met. Minutes from that meeting state that plaintiffs' culvert permit "may not be approved until R.J. Anderson resolves Village objections. The Village Attorney is to make contact with Mr. Anderson in order to expedite permit approval." Defendants Coffin, Althans, Ausman, Sklar, Clemetsen, Swa-

back, Schmitt, Doughty and Johnson were present at the January 23, 1979 meeting.

Ms. Kabbes in her uncontradicted affidavit states that on February 13, 1979 she called the LGCCE engineer and reminded him that if, in fact, the Village owned the proposed construction site, the Village should sign the permit application.

Also, on February 13, 1979 the Board met again. Defendants Coffin, Athans, Ausman, Sklar, Clemetsen, Swaback, Schmidt, Mullen, and Doughty were present. Minutes of that meeting repeat that, according to IDOT, "no permit will be issued until the Village is satisfied with the conditions of the permit."

On March 8, 1979 IDOT received another set of LGCCE's revised plans. LGCCE had satisfied all of the Village's objections, except that: (1) the inverts were different from those suggested by the Village; (2) LGCCE agreed to treat the backslopes and roadway as required by the ordinance in effect at the time the subdivision was approved, not as suggested by the Village. This new set of plans proposed a single corrugated steel culvert, instead of two concrete culverts.

On April 10, 1979 the LGCCE engineer wrote IDOT and asked about the status of plaintiffs' permit application. On May 21, 1979 LGCCE's engineer wrote the Village Engineer to ask about the status of its permit review.

In early June 1979 Ms. Kabbes called the LGCCE engineer and said that LGCCE's culvert design would meet IDOT's standards if LGCCE provided easements for creek drainage.

On June 6, 1979 the LGCCE engineer wrote Ms. Kabbes and requested guidelines as to the limits of the easements.

On June 13, 1979 Mr. Anderson wrote to IDOT to inquire what was delaying the issuance of the permit.

Mr. Mullen received a copy of Mr. Anderson's June 13, 1979 letter. On June 15, 1979 Mr. Mullen wrote Mr. Bleck, the Village Engineer, and asked him to write to IDOT to detail "what, if any, existing prob-

lems still remain in the revised plans for the Buffalo Creek Crossing."

On July 12, 1979 Mr. Bleck wrote IDOT. Mr. Bleck raised twelve objections to the proposed culvert. Mr. Bleck stated that (1) the invert elevation was high, possibly due to a difference in the data used by the Village and by LGCCE; (2) LGCCE should file easement documents for the construction; (3) the culvert lengths were "deficient"; (4) LGCCE should adequately provide for the interception of roadway ditch flows; (5) LGCCE should provide concrete slope walls and cut-off walls at the end of the culverts; (6) LGCCE should provide steel plate beam guard rails in hazardous areas; (7) LGCCE should provide rip-rap in the creek bottom; (8) the banks of the creek should be sodded and pegged; (9) LGCCE should provide for a connection with a storm sewer in Sumter Drive; (10) LGCCE should provide for the improvement of conditions upstream; (11) LGCCE should provide for roadway cross-sections; (12) LGCCE should provide creek profiles or cross-sections.

Mr. Bleck also reiterated that the Village, as owner of the street right-of-way, should sign the permit. Mr. Bleck also requested that LGCCE apply for the permit "through the Village so that the Village's requirements may be properly addressed . . ."

On July 17, 1979 Ms. Kabbes received a letter from Mr. Bleck, which reiterated that the Village owned the road right-of-way and should therefore be the permit applicant.

On July 26, 1979 Mr. Anderson wrote IDOT and stated that, with the exception of the invert grades, the revised plans met all the Village's December 5, 1978 objections. Mr. Anderson requested a final determination of the permit application.

On December 10, 1979 Mr. Mullen wrote IDOT and asked about the status of LGCCE's permit application. Mr. Mullen wrote that neither Mr. Anderson nor the LGCCE engineer had contacted the Village about resolving the Village's objections.

On January 2, 1980 Ms. Kabbes wrote Mr. Mullen. Ms. Kabbes wrote that in

June of 1979 IDOT had asked LGCCE to (1) either redesign the culvert crossing so as to meet IDOT's head criteria or (2) provide easements on the property upstream of the northern most culvert below the elevation of 712.5 feet M.S.L. 1929 Adj. Ms. Kabbes wrote that IDOT had not received any additional information from LGCCE. Finally, she wrote that, because the Village was the "local permitting agency," IDOT would not issue a permit until the Village no longer objected.

On February 26, 1980 Mr. Mullen wrote Ms. Kabbes. He stated that, under Ill.Rev. Stat. ch. 109, ¶ 3, the Village owned the road right-of-way on which LGCCE sought to build a culvert.

On March 7, 1980 IDOT engineer Mr. David Boyce wrote to LGCCE's attorney. Mr. Boyce stated that the current culvert plans would cause a .74 ft. increase in flood stage for the 100–year flood, thus exceeding IDOT guidelines. Mr. Boyce suggested, as an alternative to another design, that LGCCE provide drainage easements for the affected lots upstream. Mr. Boyce included a model easement form and stated that "upon receipt of either revised plans meeting the Department guidelines, or a series of easements as described above, we will be in a position to recommend permit issuance."

On March 18, 1980 Robert Anderson wrote Mr. Boyce, stating that LGCCE intended to resubmit LGCCE's original two-culvert design to IDOT.

On March 21, 1980 IDOT received LGCCE's (1) original twin concrete culvert plans; (2) new calculations for the twin culverts. After Ms. Kabbes received the new information from the LGCCE engineer, she determined that the twin box culverts met the IDOT head criteria. Ms. Kabbes believed that at this point only the ownership dispute between LGCCE and the Village prevented IDOT from issuing the permit. (Tr. 851).

In an attempt to resolve this dispute Ms. Kabbes arranged a meeting with LGCCE and the Village on June 16, 1980. At that meeting an IDOT representative indicated that IDOT believed that the Village owned the road right-of-way and therefore must sign the permit application.

Plaintiffs requested neither a hearing under Ill.Rev.Stat. ch. 19 ¶ 75 nor judicial review under Ill.Rev.Stat. ch. 19 ¶ 75a.

On June 16, 1980 plaintiffs petitioned the Village Board of Local Improvements under Ill.Rev.Stat. ch. 24 ¶ 9–2–40 to construct the culvert crossing by special assessment. Plaintiffs also filed a writ of mandamus in their state court case (no. 77 MR 176), seeking to force the Village to recommend construction, by special assessment, of the Buffalo Creek culvert. In November 1980 the state trial court dismissed plaintiffs' writ as premature.

On September 23, 1980 the Village Board of Local Improvements denied the petition. Mr. Mullen stated that the Board had "in part denied the petition on the grounds that improvements in this area are obligations by the developer and are currently in litigation." Defendants Althan, Ausman, Homburg, Sklar and Swaback voted to deny the petition. Defendants Coffin, Mullen, Doughty and Johnson were also present at the meeting.

### 2. *Building Permit Facts*

On September 22, 1977 Mr. Anderson and LGCCE sued the Village in the Circuit Court of Lake County to obtain *inter alia:* (1) a declaration that Ordinance 77–0–8 was invalid; (2) an injunction preventing the Village from enforcing subdivision standards other than those established by ordinance; and (3) damages.

The Village counterclaimed, seeking *inter alia:* (1) an injunction requiring plaintiffs to make certain public improvements; (2) payment of fees incurred by the Village.

On April 6, 1978 the parties and the trial judge signed an agreed judgment order ("AJO") which provided, *inter alia,* that: (1) Ordinance 77–0–8 would not apply to LGCCE; (2) the Village would issue building permits for lots for which plaintiffs delivered a letter of credit guaranteeing certain public improvements; (3) Mr. Anderson would file letters of credit guaranteeing certain improvements if the Vil-

lage obtained the necessary easements; (4) plaintiffs would make certain improvements within one year, others within two years and others "with reasonable diligence" after the Village obtained the necessary easements; (5) plaintiffs would install an 11–inch stonebase and 2½ inch asphalt surface on certain roads in Units 2–7 and 9; (6) the plaintiffs' obligations under the AJO ended after 25 months; (7) all improvements except those involving roadway composition would be made in accordance with the ordinances in effect at the time LGCCE was platted.

Plaintiffs posted the requisite letters of credit. The Wheeling Trust and Savings Bank thereafter refused to honor these letters of credit.

The Richards Group, a purchaser of 25 lots from the plaintiffs, sued the Village to compel it to issue building permits to its buyers. In 1978 the Village and the Richards Group settled, agreeing that the latter would pay $25,000 to defray the Village's engineering costs and that the Village would issue building permits to all buyers from the Richards Group.

Between April 1978 and November 26, 1980, the Village issued building permits to LGCCE's buyers. But on June 26, 1979 the Village sued to enforce the AJO, alleging that the plaintiffs had breached its obligations thereunder. The Village sought *inter alia:* (1) an injunction requiring that plaintiffs install all public improvements by October 1, 1979; (2) a rule to show cause against plaintiffs; (3) an order that plaintiffs correct certain public improvements; (4) a declaration that the Village could cease issuing building permits in units in which plaintiffs had not correctly installed public improvements; and (5) the Village's engineering fees.

On October 2, 1979 plaintiffs filed (1) a counterpetition to enforce the AJO and (2) a claim for damages. During the trial on both petitions, the parties presented evidence as to (1) the quality and existence of certain public improvements; (2) the Village's objections to the plaintiffs' Buffalo Creek culvert permit application; and (3) the enactment of the 1964 Regulations.

On August 25, 1980 the Circuit Court of Lake County found that the 1964 Regulations were invalid. On November 19, 1980 the Circuit Court held that (1) the AJO could not be specifically enforced; (2) the plaintiffs' claim for damages against the Village was moot.

On November 26, 1980 the Village Administrator Mr. Doughty wrote to the Village Building Commissioner. He stated that, due to a decision in *Anderson v. Long Grove*, the Village Attorney Mr. Mullen advised that (1) the court had ruled against Mr. Anderson and (2) no building permits should issue for construction in Units 3, 4, 5, 6, 7 and 9 of LGCCE. Mr. Doughty also stated that "due to a court ordered commitment with" the Richards Group, building permits would issue to its buyers. Finally, Mr. Doughty stated that this procedure would be followed until further notice, "[a]s directed by the Village President and Village Counsel."

On September 8, 1981 Mr. Herman Semar, a buyer of LGCCE lot # 238, addressed the Village Board, stating that he had been unable to get a building permit. The Board explained that the Village was in litigation with Mr. Anderson to try to get him to make certain "necessary improvements required of all Long Grove developers."

On November 24, 1981 both Mr. Semar's lawyer and Mr. Meister, the buyer of lot # 254, addressed the Village Board. The Board denied Mr. Semar a building permit, stating that Mr. Anderson had not completed all the public improvements, specifically Schaeffer Road.

Mr. Semar and Mr. Meister sued the Village to compel the issuance of building permits. This litigation was settled by (1) the Village's agreeing to issue building permits to both Mr. Semar and Mr. Meister; (2) Mr. Semar and Mr. Meister's agreeing to waive any claim against the Village based upon any incomplete improvements.

On March 25, 1982 the Village filed a declaratory judgment action (82 MR 88) in state court, asking that the court declare that the Village need not issue building

permits to plaintiffs' buyers by reason of the Amendments (the 1979 Amendments to Ordinance 77–0–8). In April 1982 the Village filed a lis pendens notice on plaintiffs' real estate. This notice described the Village's 82 MR 88 declaratory judgment action.

Both the Village and LGCCE appealed the Circuit Court's August and November 1980 decisions. On August 9, 1983 the Appellate Court of Illinois, Second District, held that the Circuit Court: (1) correctly refused to specifically enforce the agreed judgment order; (2) correctly refused to declare that the Village could stop issuing building permits to plaintiffs' buyers, since nonparties to the action would be affected by such a declaration; (3) incorrectly struck the 1964 Regulations; and (4) incorrectly found that plaintiffs' claim for damages was moot. The Illinois Appellate Court remanded for a hearing on the questions whether plaintiffs (1) owed fees to the Village under the 1964 Regulations and (2) could recover damages.

On remand, the Village officials filed motions to dismiss the plaintiffs' counterpetition. Plaintiffs thereafter moved to voluntarily dismiss their counterpetition. On August 23, 1984 the Circuit Court of Lake County denied this motion and instead granted on *res judicata* grounds the individual defendants' motions for summary judgment. That court reasoned that the Illinois Appellate Court had remanded only as to plaintiffs' claims against the Village itself, and that the 1980 judgment was a "final judgment" on the merits as to claims against the individual defendants. The Circuit Court of Lake County denied the Village's motion for summary judgment. LGCCE and Mr. Anderson appealed the order granting the individual defendants' motions for summary judgment.

On March 18, 1986 the Illinois Appellate Court, Second District, held that the Circuit Court of Lake County should have allowed the plaintiffs to voluntarily dismiss their counterpetition for damages against the Village officials. The Illinois Appellate Court therefore reversed the Circuit Court of Lake County's grant of summary judg-

ment. The Illinois Appellate Court noted that the Village's claim against LGCCE/Mr. Anderson and the latter's counterpetition against the Village itself still pended in the Circuit Court of Lake County.

In October 1987 the state court litigation went to trial (cases, nos. 80 L 430, 77 MR 176). In their Answer to the Village's complaint in case 80 L 430, LGCCE/Mr. Anderson stated that the Village had (1) failed to approve engineering plans for the construction of culverts in Buffalo Creek; (2) refused, after November 12, 1980, to issue building permits to individual lot purchasers; (3) applied Ordinance 77–0–8 to lots in LGCCE after November 25, 1980.

On October 26, 1987 the Circuit Court of Lake County found the following facts: (1) LGCCE had misaligned Pottawotomie Court Road and failed to complete Antietam Drive west of Schaeffer Road; (2) LGCCE had not violated Paragraph 7(A) of the AJO, which required Mr. Anderson to file a letter of credit to provide for certain improvements; (3) the Village had not obtained the easement called for in Paragraph 7(B) of the AJO, so that LGCCE was relieved of its obligations under that subparagraph; (4) the Village was not entitled to the engineering fees called for by the 1964 Regulations, because under the AJO (except as to road composition improvements) the 1964 Regulations did not apply to LGCCE; (5) the parties had not agreed to shift attorney's fees; (6) the AJO binds Mr. Anderson; and (7) the AJO is divisible.

## DISCUSSION

Fed.R.Civ.P. 56(c) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element (1) essential to that party's case and (2) on which that party will bear the burden of proof at trial.

### I. *Culvert Permit Facts*

Before addressing the merits of plaintiffs' culvert permit claims, this court must decide whether these claims are ripe for review. Under recent Supreme Court and

Seventh Circuit law, plaintiffs' culvert permit claims are not ripe for review.

The ripeness requirement in land use challenges is designed to avoid premature review of administrative action. *Unity Ventures v. Lake County,* 841 F.2d 770, 774 (7th Cir.1988), *quoting Herrington v. County of Sonoma,* 834 F.2d 1488, 1494 (9th Cir.1987).

In *MacDonald, Sommer & Frates v. Yolo County,* 477 U.S. 340, 106 S.Ct. 256, 91 L.Ed.2d 285 (1986), the Supreme Court wrote that a regulatory "taking" claim is not ripe until the government has made a final decision as to what use of the property will be allowed. The Seventh Circuit in *Unity Ventures, supra* 841 F.2d at 775, held that (1) this ripeness analysis also applies to equal protection and due process claims; (2) ripeness requires both (a) a rejected development plan and (b) the denial of a variance. *Id.*

In *Unity Ventures,* Lake County had given the Village of Grayslake the right to approve all connections to Lake County's Northeast Interceptor, an underground pipe which connected with a sewage treatment plant. Plaintiff wished to construct a connection between his property and the Northeast Interceptor. He submitted a plan to the Lake County Public Works Department. The director of the Lake County Public Works Department approved the plan, but the Mayor of Grayslake did not. The Mayor stated that Grayslake would not consent "at that time" to the proposed Northeast Interceptor Connection. The Mayor was concerned with the sewer's capacity to accommodate the property of developers who annexed to Grayslake. Plaintiff did not thereafter make a formal connection application to either Lake County or Grayslake.

The Seventh Circuit held that plaintiff's constitutional claims were not ripe. At the very least, the Seventh Circuit wrote, plaintiff should have sought formal approval from the Grayslake Board of Trustees at a regular meeting. *Unity Ventures, supra,*

841 F.2d at 776. The Seventh Circuit also wrote:

> The Village's hesitation to approve Alter's application because of questions about capacity points up the rationale behind the final decision requirement. If the plaintiff had presented a formal application to the Grayslake Board of Trustees with adequate documentation about the density of the proposed development and the anticipated volume of sewage the connection would have to accommodate, then the Village could have made a reasoned decision about the Northeast Interceptor's ability to handle the excess. And if the Village still denied the application, a court would have a basis on which to evaluate the impact and extent of the Village's denial.

*Id.*

In the present case, IDOT never definitively rejected plaintiffs' culvert permit application. Plaintiffs' evidence shows that, in March, 1980, after IDOT received plaintiffs' last set of plans and calculations, Ms. Kabbes determined that only the Village's objections prevented IDOT from issuing the permit. There is no evidence that the Village stated that it would *never* approve the culvert permit. Specifically, there is no evidence that, if plaintiffs had satisfied the Village's July 12, 1979 objections, the Village would have refused to approve the permit. Instead, the evidence [2] suggests that the Village would have approved the culvert permit once its design concerns were satisfied.

While plaintiffs tried to satisfy the Village's December 5, 1978 objections to their initial proposal (by sending revised plans to both IDOT and to the Village engineer) plaintiffs did not try to resolve the Village's July 12, 1979 objections to the revised plans.[3] Instead, on March 21, 1980 plaintiffs resubmitted with new specifications their original two-culvert plans.

In short, plaintiffs did not work with the Village to resolve its second set of objections. Had they done so, with documenta-

---

**2.** *See e.g.* Mr. Mullen's June 15, 1979 letter.

**3.** Mr. Anderson's July 26, 1979 letter to IDOT did not address the Village's July 12, 1979 objections.

tion as to the Village's objections, then the Village could have made a "reasoned decision" about the adequacy of the revised culvert plans. *See Unity Ventures, supra,* 841 F.2d at 776.

■ The final decision requirement can be met with proof that attempts to comply would be futile. A developer's mere allegation that he has done everything possible to obtain acceptance of a development proposal does not prove futility. *Unity Ventures, supra,* 841 F.2d at 775–6, *discussing Herrington v. County of Sonoma,* 834 F.2d 1488 (9th Cir.1987). At a minimum, the developer must show that he made at least one meaningful application for a development permit. *Id.*

■ Plaintiffs in this case have not shown that attempts to comply with the Village's requirements would have been futile. *Cf. Herrington v. Sonoma County,* 834 F.2d 1488, 1496 (9th Cir.1987) (evidence showed that submission of environment impact report would have made no difference in County's decision to reject plaintiffs' subdivision application). Plaintiffs did not make a single meaningful application for the culvert permit, since they abandoned their application after modifying the design once. *See Kinzli v. City of Santa Cruz,* 818 F.2d 1449, 1455 (9th Cir.1987). The securing of a culvert permit may be a long process involving several rounds of negotiations and modifications. Plaintiffs withdrew from that process before it was clear that their culvert application would finally be denied.

For the foregoing reasons, this court dismisses plaintiffs' culvert claims as unripe. Assuming *arguendo* that these claims are ripe, this court would dismiss them on their merits.

### A. Procedural Due Process

#### 1. *Right to a Culvert Permit*

To establish a due process violation plaintiffs must show that (1) they had a property interest; (2) they were deprived of that interest without due process of law.

"To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972).

■ The Seventh Circuit considers "property," for due process purposes, as that which is "securely and durably yours under ... law, as distinct from what you hold subject to so many conditions as to make your interest meager, transitory or uncertain." *Reed v. Village of Shorewood,* 704 F.2d 943, 948 (7th Cir.1983). Put another way, "a legitimate claim of entitlement is created only when statutes or regulations ... establish a framework of factual conditions delimiting entitlements which are capable of being explored at a due process hearing." *Eidson v. Pierce,* 745 F.2d 453, 459–60 (7th Cir.1984). If state law creates a system of nondiscretionary rules governing receipt of a certain benefit, an applicant has a legitimate claim of entitlement. *See Cornelius & Cornelius Contractors Corp. v. LaCroix & Milwaukee Sewerage District,* 838 F.2d 207, 210 (7th Cir.1988).

Several statutes are relevant to plaintiffs' claim to a property interest in a culvert permit. Ill.Rev.Stat. ch. 19 ¶ 65 provides:

It is unlawful ... to build any structure ... in any of the public bodies of water within the State of Illinois, without first submitting the plans, profiles and specifications therefore, and such other data and information as may be required, to the Department of Transportation of the State and receiving a permit therefor signed by the Secretary of the Department and authenticated by the seal therefor.

\* \* \* \* \* \*

Any structure, fill, or deposit erected or made in any of the public bodies of water of this State, in violation of this Section, is a purpresture and may be abated as such at the expense of the person, corporation, company, city, municipality, or other agency responsible

therefor, or if, in the discretion of the Department of Transportation, it be decided that the structure, fill, or deposit may remain, the Department may fix such rule, regulation, requirement, restrictions, or rentals or require and compel such changes, modifications and repairs as are necessary to protect the interest of the State.

The Department of Transportation may grant, subject to the foregoing provisions of this Section, a permit to any person, firm or corporation, not a riparian owner, to use the water from any of the public bodies of water within the State of Illinois for industrial manufacturing or public utility purposes, and to construct the necessary intakes, structures, tunnels, and conduits in, under, or on the beds of such bodies of water to obtain the use of such water or to return the same, provided, however, that such use shall not interfere with navigation. Such permit shall be for a definite period of years not exceeding 40 years and may be renewed subject to the same time limitation. If the water so to be used is to be taken from a lake or stream located in or adjoining any municipality, such permit shall not become effective until approved by the Commissioner of Public Works of such municipality, or if it has no Commissioner of Public Works of such municipality, or if it has no Commissioner of Public Works, by the Public (or City) Engineer, or if it has no such Engineer, by the Mayor or President of the Municipality.

Subject to the notice and hearing hereinafter provided for, where a permit is sought for a structure, fill, or deposit in a slip, the Department shall require as condition precedent to the issuance of such permit, a signed statement approving such action by all riparian owners whose access to public waters will be directly affected by such structure, fill, or deposit. No such permit shall be issued without the approval of the Governor and without a public hearing, 10 days' notice of the time, place, and purpose of which is published in a newspaper of general circulation in the county in which such slip is located. Whenever a permit to fill or deposit in a slip is issued, all work done pursuant to the permit is by authorization and under the direction of the Department of Transportation.

Ill.Rev.Stat. ch. 19 ¶ 70 provides:

It shall be the duty of the Department of Transportation to ... prevent the carrying capacity of streams to be limited and impaired by ... bridges over the (water courses), to an extent where the same cannot safely dispose of the flood waters which may naturally, lawfully, and properly be discharged therein; to require such changes in bridges ... necessary to meet the demands of navigation and commerce thereon ...

\* \* \* \* \* \*

It shall be unlawful for any person, persons, corporations, counties, cities, municipalities, or other agency to make any fill, deposit, or encroachment in, deposit or placement of felled or trimmed woody plant upon or along the bank, or erect any bridges over a stream that has a drainage area of one square mile or more in urban areas or 10 square miles or more in rural areas, until plans, profiles and specifications and other data which may be required, have been first filed with the said Department of Transportation of this State, and a written permit received therefor.

Ill.Rev.Stat. ch. 19 ¶ 75 provides that the Department of Transportation may make any investigation and conduct any hearing as may be necessary to the performance of its duties.

Ill.Rev.Stat. ch. 19 ¶ 75a provides that all final decisions of the Department of Transportation shall be subject to judicial review under the Administrative Review Act.

Ill.Rev.Stat. ch. 19 ¶ 76 provides that Chapter 19 §§ 52–78 shall be construed: in a liberal manner for the purpose of preserving to the State of Illinois and the people of the State ... the rights which (they) may have in any of the public waters ... and to give them ... the fullest possible enjoyment thereof, and to prevent to the fullest extent, the slight-

est improper encroachment or invasion upon the rights of the State of Illinois, or of any of its citizens with reference thereto."

Ill.Rev.Stat. ch. 24 ¶ 9–2–9 provides:

All ordinances for local improvements to be paid for wholly or in part by special assessment or special taxation shall originate with the board of local improvements. Petitions for any local improvement shall be addressed to that board. The board may originate a scheme for any local improvement to be paid for by special assessment or special tax, either with or without a petition, and in either case shall adopt a resolution describing the proposed improvement.... This resolution shall be at once transcribed into the records of the board.

Whenever the proposed improvement requires that private or public property be taken or damaged, the resolution shall describe the property proposed to be taken or damaged for that purpose. The board, by the same resolution, shall fix a day and hour for a public hearing thereon. The hearing shall not be less than 10 days after the adoption of the resolution.

\* \* \* \* \* \*

Notice of the time and place of the public hearing shall be sent by mail directed to the person who paid the general taxes for the last preceding year on each lot, block, tract, or parcel of land fronting on the proposed improvement not less than 5 days prior to the time set for the public hearing. These notices shall contain (1) the substance of the resolution adopted by the board, (2) when an estimate is required by this Division 2 the estimate of the cost of the proposed improvement, and (3) a notification that the extent, nature, kind, character, and (when an estimate is required by this article) the estimated cost of the proposed improvement may be changed by the board at the public hearing thereon. If upon the hearing the board deems the proposed improvement desirable, it shall adopt a resolution and prepare and submit an ordinance therefor.

Ill.Rev.Stat. ch. 24 ¶ 9–2–10 provides:

At the time and place fixed in the specified notice for the public hearing, the board of local improvements shall meet and hear the representations of any person desiring to be heard on the subject of the necessity for the proposed improvement, the nature thereof, or the cost as estimated.

Ill.Rev.Stat. ch. 24 ¶ 9–2–40 provides:

Whenever the owners of one-half of the property abutting on any street ... petition for any local improvement thereon, the board of local improvements in any municipality shall take steps hereinbefore required for hearing thereon, but at that hearing shall consider only the nature of the proposed improvement and the cost thereof. The board shall determine ... the nature of the improvement which it will recommend and thereupon shall prepare and transmit to the corporate authorities a draft of an ordinance ... and shall recommend the passage thereof.

Neither party has referred this court to any relevant IDOT regulations.

Two IDOT practices are also relevant: (1) the pre–1978 policy of issuing a public notice of proposed construction only after IDOT had approved the plans; (2) the policy of holding permits in abeyance, if someone objected to them, until either the applicant and objector resolved their differences or IDOT decided that the objections had no merit.

Having set forth the relevant Illinois statutes and practices, this court will discuss whether they give rise to a property interest in a culvert permit.

■ The relevant Illinois statutes do not entitle plaintiffs to a culvert permit; these statutes do not substantively restrict IDOT's discretion. Ill.Rev.Stat. ch. 19 ¶ 65 sets forth a few minimum requirements for construction permits. For example, IDOT must provide notice and a hearing before it issues a construction permit. All riparian owners whose access will be directly affected by a structure must approve that structure before IDOT can issue the permit. But Ill.Rev.Stat ch. 19 ¶ 65 does not state

any circumstances in which IDOT *must* issue permits; it does not create "a system of nondiscretionary rules" governing issuance of construction permits. *See Cornelius & Cornelius Contractors Corp. v. LaCroix & Milwaukee Sewerage District*, 838 F.2d 207, 210 (7th Cir.1988); *Scott v. Village of Kewaskum*, 786 F.2d 338, 340 (7th Cir.1986). And when a structure has been built without an IDOT permit, the statute explicitly gives IDOT discretion to (1) have the structure abated; (2) require any changes as are necessary to protect the interests of the State.[4]

Ill.Rev.Stat. ch. 24 ¶ 9–2–40 does not give plaintiffs a right to an IDOT permit; it does not even refer to such a permit. Neither does Section 9–2–40 give plaintiffs a property interest in construction of the culvert by special assessment.

Section 9–2–40 seems to mandate that, upon a petition for a local improvement by half of the landowners abutting on a street, the Board of Local Improvements ("BLI") shall prepare an ordinance describing the improvement and recommending the passage thereof. Illinois courts have held that this statute (or its predecessor) requires the passage of an ordinance "looking toward the improvement." *See e.g. People v. Village of Millstadt*, 254 Ill.App. 39 (1929); *People v. City of Champaign*, 164 Ill.App. 289 (1911). But other Illinois courts have stressed that the determination of what constitutes a local improvement is within the discretion of the corporate authorities. *In re City of Woodstock Spec. Assessment*, 115 Ill.App.3d 502, 71 Ill.Dec. 272, 277, 450 N.E.2d 960, 965 (1983); *Matter of Village of Creve Coeur*, 46 Ill.App.3d 772, 5 Ill. Dec. 151, 154, 361 N.E.2d 290, 293 (1977); *People v. City of Rock Island*, 45 Ill.App. 2d 76, 86 (1963). Further, Illinois courts have also held that bridges such as the one plaintiffs sought to have constructed are not "local improvements." *Village of Mar-*

issa v. Jones, et al.*, 327 Ill. 180, 158 N.E. 389 (1927); *City of Chicago Heights v. F.A. Walls, et al.*, 319 Ill. 411, 150 N.E. 241 (1926); *City of Waukegan v. DeWolf*, 258 Ill. 375, 382, 101 N.E. 532 (1913). *See also People v. Caliendo*, 50 Ill.2d 72, 72, 277 N.E.2d 319 (1971) (transportation improvements create general, not local benefits).

■ In short, despite the language of Section 9–2–40, state law does not entitle plaintiffs to construction of the proposed culvert by special assessment. And, assuming *arguendo* that defendants violated Section 9–2–40, a mere violation of state law does not violate 42 U.S.C. § 1983. *Coniston Corp. v. Village of Hoffman Estates*, 844 F.2d 461, 467 (7th Cir.1988).

■ Neither do IDOT's past practices give plaintiffs a property interest in a culvert permit. While Ms. Kabbes testified in her deposition that, until 1978, IDOT generally had issued a public notice only after it had informally approved construction plans, she also testified that it was Mr. Anderson who pointed out that this policy created undue delays. Ms. Kabbes testified that, as an accommodation to Mr. Anderson, she issued the public notice prior to IDOT's approval of the LGCCE culvert plans.[5] Even if IDOT's past practice might potentially create a legitimate claim of entitlement, it did not do so in the circumstances of this case.

■ IDOT's second practice—that of holding a permit application in abeyance until the applicant and the objector resolved their differences—similarly did not give plaintiffs a property interest in a culvert permit. On the contrary, this practice only suggests that IDOT has historically exercised wide discretion in issuing construction permits.

---

**4.** The fact that Ill.Rev.Stat. ch. 19 ¶ 65 expressly gives IDOT discretion to abate structures built without a permit might suggest that, where the statute does not explicitly give IDOT discretion, IDOT does not have discretion. But this analysis does not square with settled procedural due process principles, which provide that the lack

of substantive restrictions on the State's discretion is sufficient to bestow discretion, for due process purposes, on the State. *See* cases cited in text.

**5.** Plaintiffs did not produce any evidence contradicting Ms. Kabbes' testimony on this point.

### 2. Lack of Due Process

■ Even if the above Illinois statutes or practices gave plaintiffs a property interest in a culvert permit, plaintiffs were not deprived of this interest without due process. Not every deprivation of property by a state violates the Fourteenth Amendment. Due process requires only an opportunity granted at a meaningful time and in a meaningful manner for a hearing appropriate to the case. *See Boddie v. Connecticut*, 401 U.S. 371, 378, 91 S.Ct. 780, 786, 28 L.Ed.2d 113 (1971).

In deciding what sort of hearing is appropriate to each case courts have considered (1) the private interest affected by the official action; (2) the risk of erroneous deprivation of such interest through the procedures used; (3) the probable value of additional procedure; and (4) the burden to the State in providing additional procedures. *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976).

■ After analyzing the above factors, this court concludes that the procedures actually used by IDOT pass constitutional muster. First, the private interest at stake, the ability to construct a culvert or to have that culvert constructed by special assessment, is not as compelling as that considered in *Mathews v. Eldridge, id.*, or in *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970).

Second, the procedures actually used did not unduly risk an erroneous decision. In deciding whether to issue a construction permit to LGCCE, IDOT (1) published notice of the proposed construction; (2) accepted comments from all interested parties; (3) informed LGCCE of the obstacles to permit approval; (4) attempted to get LGCCE and the Village defendants to agree on a design; (5) ruled on the validity of the Village's objections by determining that the Village was the property owner and so must sign the permit application. Plaintiffs did not request a hearing under Ill.Rev.Stat. ch. 19 ¶ 75.

Third, any additional procedures would burden IDOT without providing much additional assurance of a correct decision. The final obstacle to permit approval—the validity of the Village's claim to ownership of the construction site—required a legal determination. A formal hearing would not have assisted IDOT in making this legal determination.

■ Any deprivation of plaintiffs' putative right to construction of the culvert by special assessment was similarly not without due process. Plaintiffs were given both reasonable notice and an opportunity for a fair hearing before the Board of Local Improvements denied their petition. On September 23, 1980 the Board of Local Improvements met to vote on plaintiffs' petition. Mr. Anderson was present and spoke at that meeting. When the Board denied Mr. Anderson's petition, they explained their reasons. Specifically, the Board stated that they believed that uncompleted subdivision improvements were Mr. Anderson's obligation and were currently in litigation. *See Littlefield v. City of Afton*, 785 F.2d 596, 603 (8th Cir.1986).

### B. Substantive Due Process

■ To survive summary judgment on a substantive due process claim, plaintiffs must present evidence from which a jury can infer that the denial of the culvert permit (1) deprived plaintiffs of their property (2) for a private, *i.e.* irrational or invidious purpose. *Coniston Corporation v. Village of Hoffman Estates*, 844 F.2d 461, 466–7 (7th Cir.1988).

■ Plaintiffs have not presented evidence from which a jury could reasonably infer that plaintiffs were deprived of their land by IDOT's conditional refusal to issue them a culvert permit. Plaintiffs lost only the "right" (1) to proceed with their subdivision development at their preferred schedule; (2) to sell certain subdivision units to persons who would not buy these units until plaintiffs had received a culvert permit. Such a minimal incursion into plaintiffs' property rights is not a "deprivation" of plaintiffs' property. *Coniston Corporation, supra*, 844 F.2d at 466.

Similarly, plaintiffs have not presented evidence that IDOT or the Village acted from a "private" purpose, *i.e.* an irrational

or invidious purpose. *Coniston Corporation, supra,* 844 F.2d at 467.

There is no evidence that IDOT acted pursuant to a racial or other invidious motive. The evidence instead suggests that IDOT and the Village acted pursuant to good faith concern for the public interest.

The evidence shows the following: (1) IDOT rejected plaintiffs' initial culvert proposal because it would cause excessive water; (2) IDOT rejected the September 29, 1978 plans because the calculations were deficient; (3) IDOT rejected the October 10, 1978 plans because they were not consistent with the plaintiffs' calculations; (4) IDOT rejected later plans because IDOT believed that the Village owned the road right-of-way under the construction site and should therefore sign the permit application.

■ A jury could not reasonably infer that IDOT acted irrationally or invidiously in denying plaintiffs' culvert permit. IDOT's objections to the first set of plans were clearly based on engineering concerns. And when IDOT acted on plaintiffs' later plans by insisting that the true owner of the construction site sign the permit application, IDOT acted pursuant to its duty to "prevent to the fullest extent the slightest possible encroachment ... upon the rights of the State of Illinois or any of its citizens ..." Ill.Rev.Stat. ch. 19 ¶ 70.

■ Similarly, there is no evidence that the Village acted irrationally or invidiously when it objected to plaintiffs' culvert permit application. If the Village actually owned the right of way under the construction site, the Village clearly could impose conditions on the culvert permit. And even assuming that the Village did not, at the time of LGCCE's application, own the construction site, the Village would own the site once the Village "accepted" it.[6] The Village would also be responsible for maintaining the culvert once it was constructed.

The Village was legitimately concerned, therefore, with the design of the culvert. There is no evidence from which a jury could infer that the Village acted from any other, less legitimate concern. For the foregoing reasons, this court dismisses plaintiffs' culvert permit/substantive due process claim.

C. Fifth Amendment Taking

■ Plaintiffs' Fifth Amendment claim is defeated by the Supreme Court's decision in *Williamson v. County Regional Planning Commission v. Hamilton Bank of Johnson City,* 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985). In *Williamson* the Supreme Court held that "if a state provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the just compensation clause until it has used the procedure and been denied just compensation." 105 S.Ct. at 3121; *see also MacDonald, Sommer & Frates v. Yolo County, et al.,* 477 U.S. 340, 106 S.Ct. 2561, 91 L.Ed.2d 285 (1986); *Coniston Corporation v. Village of Hoffman Estates,* 844 F.2d 461, 463–4 (7th Cir.1988).

In *Williamson* the Court reasoned as follows:

The Fifth Amendment does not proscribe the taking of property; it proscribes the

---

6. It is not clear whether, at the time Mr. Anderson applied for the culvert permit, he or the Village owned the right of way under the proposed culvert. Under Illinois law, a municipality does not acquire title to dedicated streets until the municipality "accepts" them. *First Nat. Bank of Lake Forest v. Village of Mundelein,* 166 Ill.App.3d 83, 116 Ill.Dec. 584, 588, 519 N.E.2d 476, 480 (1988); *Water Products Co. of Illinois v. Gabel,* 120 Ill.App.3d 668, 76 Ill.Dec. 194, 458 N.E.2d 594 (1983); *LaSalle National Bank v. City of Chicago,* 19 Ill.App.3d 883, 312 N.E.2d 322 (1974). Acceptance can be express, as by a municipality's resolution, or implied, as by a municipality's use or maintenance of the street.

But a municipality's mere approval of a plat does not constitute acceptance. *Village of Elmwood v. Newell,* 47 Ill.App.2d 27, 197 N.E.2d 467 (1964).

In August, 1978 when Mr. Anderson applied for a culvert permit, the right of way under the construction site had been dedicated to the Village. It is not clear, however, whether the Village had accepted the dedication. Defendants have not presented any evidence that the Village had used or improved the construction site. Neither have the defendants presented evidence of any declaration by the Village of its intent to accept the dedication.

taking of property without just compensation ... nor does the Fifth Amendment require that just compensation be paid in advance of, or contemporaneously with, the taking; all that is required is that "a reasonable certain and adequate provision for obtaining compensation" exists at the time of the taking ...

473 U.S. at 172, 105 S.Ct. at 3121.

Plaintiffs have not shown that Illinois does not provide adequate compensation procedures. It appears that, under Illinois law, plaintiffs could have remedied an unconstitutional taking by suing to compel inverse condemnation proceedings. *See Flick v. Kramer*, 151 Ill.App.3d 836, 104 Ill.Dec. 949, 953, 503 N.E.2d 811, 815 (1987). Plaintiffs could have remedied a "damaging" of their property by suing for damages. *See Granite City Moose Lodge No. 272 v. Kramer*, 96 Ill.2d 265, 70 Ill.Dec. 505, 508, 449 N.E.2d 852, 855 (1983); *Rothschild et al. v. Baise*, 157 Ill.App.3d 481, 109 Ill.Dec. 550, 510 N.E.2d 418 (1987). *See also Am. Nat. Bank & Trust Co. v. City of Chicago*, 826 F.2d 1547, 1549 (7th Cir.1987).[7]

Plaintiffs' Fifth Amendment "taking" claim therefore should be dismissed. *See Four Seasons Apartment v. City of Mayfield Heights*, 775 F.2d 150, 152 (6th Cir. 1985).

## II. *Building Permit Facts*

### A. Ripeness

Plaintiffs' Due Process and Equal Protection claims (based on the Village's denial of building permits to plaintiffs' buyers) are ripe for review. Plaintiffs' Fifth Amendment "taking" claim is not.

Plaintiffs presented evidence that (1) the Village decided in November 1980 to deny building permits to plaintiffs' buyers; (2) the Village based its later refusal (in No-

vember 1981) to issue building permits to Mr. Semar and Mr. Meister on Mr. Anderson's failure to complete certain subdivision improvements, specifically Schaeffer Road.

■ As discussed above, in *Unity Ventures v. County of Lake, supra*, 841 F.2d at 775 the Seventh Circuit held that a plaintiff's procedural due process, substantive due process and equal protection claims are not ripe until plaintiff has (1) obtained a final decision, *i.e.* submitted a development plan which was rejected (2) been denied a variance. A plaintiff need not obtain a final decision, however, if further efforts to do so would be futile.

■ Plaintiffs obtained a final decision concerning building permits from the Village. In November 1980 the Village Administrator stated that no building permits would issue for certain units in LGCCE. In November, 1981 the Village Board reiterated this view to Mr. Semar, Mr. Meister and Mr. Anderson. On several occasions, Mr. Anderson asked the Village Board to change its mind, stating that he did not believe he was obligated to make/complete the disputed improvements. In short, the Village had a chance to make and in fact did make a "reasoned decision" about whether LGCCE buyers were entitled to building permits.[8]

For the foregoing reasons, this court concludes that plaintiffs' due process and equal protection claims are ripe to review.

■ This court reaches a different conclusion as to plaintiffs' Fifth Amendment "taking" claim, as a taking claim is not ripe until the state has denied plaintiff "just compensation." *Williamson County Regional Planning Commission v. Hamilton Bank*, 473 U.S. 172 at 194–97, 105 S.Ct. 3108 at 3120–22 (1985); *Kinzli v. City of*

---

**7.** Plaintiffs in fact filed an action for damages in state court but then voluntarily withdrew it. In April 1988 plaintiffs again filed their suit for damages in the Circuit Court of Lake County.

**8.** Plaintiffs have shown that the Village considered and rejected Mr. Semar's and Mr. Meister's applications for building permits, despite the fact that the Village in fact ultimately issued

permits to them. The Village steadfastly refused to issue Mr. Semar and Mr. Meister permits until they actually filed suit against the Village. This court finds that an applicant need not file a lawsuit in order to have "done everything possible" to obtain acceptance of a development proposal. *See Unity Ventures, supra*, 841 F.2d at 776.

*Santa Cruz,* 818 F.2d 1449, 1456 (9th Cir. 1987). Because plaintiffs have not yet been denied just compensation by the state, their Fifth Amendment taking claim is not ripe for review.

### 1. *Procedural Due Process—Property*

#### a. Rights to Building Permits

Plaintiffs' building permit claims arise from (1) the Village's November 1980 decision to refuse to issue building permits to plaintiffs' customers; (2) the Village's April 1982 filing of a *lis pendens* notice on plaintiffs' real estate. Plaintiffs identified and presented evidence as to two customers, a Mr. Semar and Mr. Meister, who were denied building permits.

 State law creates a property interest in a building permit if the municipality, under state law or ordinance, lacks discretion and must issue a building permit to an applicant who complies with the statutory requirements and the applicant has fulfilled the requirements. *Carolan v. City of Kansas City Mo.,* 813 F.2d 178, 181 (8th Cir.1987).

 Neither state law nor village ordinances restrict the Village's discretion to issue building permits.[9] *Cf. Littlefield v. City of Afton,* 785 F.2d 596, 602 (8th Cir. 1986) (Minnesota state law and city ordinance require that the city issue a permit upon compliance with the ordinance). Ordinance # 7 provides that "no building permit shall be issued ... until there has been filed ... a copy of said plat bearing the approval of the Plan Commission and ... the Mayor and Village Council."

Plaintiffs point out that in 1965 the Village approved their subdivision plat. But Ordinance # 7 does not mandate that the Village issue building permits to all units within recorded, approved plats. Under Ordinance # 7, an approved plat is a necessary but not sufficient condition to the issuance of building permits.

Neither do the 1964 Regulations substantively restrict the Village's discretion. The 1964 Regulations provide that (1) the recording of the final plat "authorizes" the issuance of building permits; (2) certificates of occupancy shall not issue until the Plat Officer certifies that the required improvements have been completed. The 1964 Regulations thus do not mandate the issuance of building permits upon compliance with any particular conditions.

Finally, the 1979 Amendments require that an applicant for a building permit complete subdivision improvements or post a bond before receiving a building permit. While the Amendments may sufficiently restrict the Village's discretion, plaintiffs have not presented evidence that their buyers satisfied the conditions necessary (under the Amendments) to receipt of the building permits.[10] More importantly, because the AJO states that subdivision improvements shall be in accordance with the ordinances in effect when LGCCE was platted, the 1979 amendments do not apply to LGCCE.

Plaintiffs also argue that the AJO substantively restricted the Village's discretion to issue building permits. Defendants argue, however, that the AJO does not create a constitutionally protected property interest.

In *Board of Regents v. Roth,* 408 U.S. at 578, 92 S.Ct. at 2709 the Supreme Court held that an express employment contract provision can give rise to a property interest in continued employment. Lower courts have extended *Roth* to other employment-contract rights, *e.g. Altman v. Hurst,* 734 F.2d 1240, 1242 (7th Cir.) *cert. denied,* 469 U.S. 982, 105 S.Ct.

---

9. The parties agreed in the AJO that (1) Ordinance 77-0-8 would not apply to LGCCE; (2) all subdivision improvements would be made in accordance with the ordinances in effect when LGCCE was platted. In addition, in October 1987, the Circuit Court of Lake County found that under the AJO, the 1964 Regulations only applied to roadway composition improvements in LGCCE.

10. Plaintiffs argue that, by filing the letter of credit called for by the AJO, they satisfied the 1979 Amendments requirement that they post a bond. But a letter of credit is not identical with a bond; as the defendants discovered, a letter of credit may be dishonored.

385, 83 L.Ed.2d 320 (1984); *Photos v. Township High School Dist. No. 211,* 639 F.Supp. 1050 (N.D.Ill.1986).

■ The Seventh Circuit, however, has expressed doubt about whether a non-employment contract can give rise to a property interest, *see e.g. Green v. Bd. of Sch. Com'rs of City of Indianapolis,* 716 F.2d 1191, 1192 (7th Cir.1983). *See also Brown v. Brienen,* 722 F.2d 360, 364 (7th Cir. 1983). And other courts have been reluctant to hold that non-employment contracts give rise to constitutionally protected property interests. *See Physicians' Serv. Med. Group v. San Bernardino Cty.,* 825 F.2d 1404, 1408–9 (9th Cir.1987); *Costello v. Town of Fairfield,* 811 F.2d 782, 784 (2d Cir.1987); *Waltentas v. Lipper,* 636 F.Supp. 331, 335 (S.D.N.Y.1986). In *Yatvin v. Madison Metropolitan School District,* 840 F.2d 412, 416 (7th Cir.1988), the Seventh Circuit wrote that "it is necessary to distinguish between 'mere' contract rights and property rights created by contracts." To constitute a deprivation of property under the Constitution a breach of contract must be a breach of "a contractual entitlement to property," not a breach of a contractual entitlement to a chance to acquire property. *Id.,* at 417.

■ This court believes that the Due Process Clause should not subsume all breach-of-contract claims assertable against a state. In particular, this court believes that a municipality can settle a dispute with a license or permit applicant without bestowing upon that applicant a constitutionally protected property right. A contrary holding would surely deter municipalities from settling these kinds of disputes.

This court also believes that the AJO is significantly different from the tenured employment contract in *Roth.* Immediately after entering into the AJO, both sides hotly disputed its proper interpretation. *See generally, Illinois Psychological Ass'n v. Falk,* 638 F.Supp. 876, 882, *aff'd* 818 F.2d 1337 (7th Cir.1987). And when, in November 1980, the Village decided to stop issuing building permits to plaintiffs' buyers, it did not appear that plaintiffs had an enforceable contract right to the building permits. The state court had just held that (1) the AJO could not be specifically enforced; (2) plaintiffs could not recover money damages for the Village's breach of the AJO.

But this court need not decide whether the AJO gave plaintiffs a property interest in their buyers' receipt of building permits, as even if plaintiffs had such an interest, they were not deprived of it without due process.

### b. Lack of Process

■ As discussed above, not every deprivation of property by a state violates the Fourteenth Amendment. Due Process requires only an opportunity granted at a meaningful time and in a meaningful manner for a hearing appropriate to the case. *See Boddie v. Connecticut,* 401 U.S. 371, 378, 91 S.Ct. 780, 786, 28 L.Ed.2d 113 (1971).

In deciding what sort of hearing is appropriate to each case courts have considered (1) the private interest affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used; (3) the probable value of additional procedure; and (4) the burden to the State in providing additional procedures. *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976).

After analyzing the above factors, this court concludes that the Village's procedures satisfy the Fourteenth Amendment. First, the private interest at stake, the right to build a certain development, is not as compelling as that considered in *Mathews v. Eldridge, id.* or *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970).

Second, the procedures actually used by the parties did not create an undue risk of an erroneous decision. Prior to the Village's decision to deny building permits to plaintiffs' buyers, plaintiffs participated in a full evidentiary trial before the Circuit Court. At that trial plaintiffs had an opportunity to present evidence as to whether, under the AJO, they or their customers were entitled to building permits. *See*

*Brown v. Brienen*, 722 F.2d 360, 365 (7th Cir.1983) (a state court breach of contract suit would be "process" for purposes of the Due Process Clause).

Moreover, the Village Board held regularly scheduled bi-monthly public meetings. Mr. Anderson attended and spoke at several of these meetings. Mr. Anderson also objected to the Board's various actions by letter and at least one special meeting with the Board. It does not appear that the Board denied him an opportunity to speak.

The Village's procedures vis-a-vis Mr. Semar and Mr. Meister were also sufficient. On September 8, 1981 Mr. Semar addressed the Board to voice his objections to the Board's denial of his permit application. The Village President explained that the Village would not issue the permit until Mr. Anderson made certain improvements. On November 24, 1981 Mr. Semar's attorney and Mr. Meister addressed the Board. The Board told them that it was denying their applications for building permits because Mr. Anderson had not completed Schaeffer Road. On December 8, 1981 Mr. Anderson spoke at a Board meeting, and after considerable discussion, the Board decided not to reconsider its decision to deny building permits to Mr. Semar and Mr. Meister.

■ This court concludes that (1) the procedures which the Village actually employed did not unduly risk an erroneous deprivation and (2) any additional procedures would not have greatly reduced the risk of error. *See Littlefield v. City of Afton*, 785 F.2d 596, 603 (8th Cir.1986). Due process requires not correct outcomes but only "procedures that will usually lead to correct outcomes." *Del's Big Saver Foods, Inc. v. Carpenter Cook, Inc.*, 795 F.2d 1344, 1350 (7th Cir.1986).

A recent Seventh Circuit case supports this court's conclusion. In *Coniston Corporation v. Village of Hoffman Estates*, 844 F.2d 461, 468–9 (7th Cir.1988) the Seventh Circuit held that a Village Board of Trustees' decision to reject a site plan was a legislative, rather than an adjudicative decision. The Seventh Circuit wrote that the Constitution does not require legislatures to give reasons for their enactments or to act "reasonably" in the sense that courts are required to do.

This court concludes that the Village Board's decision to deny building permits was a legislative decision and that the Board's procedures satisfy the due process requirements for such a decision. *Id.*

### 2. *Procedural Due Process—Liberty*

■ Mr. Anderson has not presented evidence from which a trier of fact could infer that he was deprived of a liberty interest. Liberty includes the right "to work for a living in the common occupations of the community." But the Supreme Court has held that even the loss of one's job does not amount to a deprivation of liberty, as long as the plaintiff remains free to locate alternate employment. *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed. 2d 405 (1976) *reh. denied* 425 U.S. 985, 96 S.Ct. 2194, 48 L.Ed.2d 811 (1976). *See also Goulding v. Feinglass, et al.*, 811 F.2d 1099 (7th Cir.1987) (no liberty interest impaired where plaintiff is not foreclosed by a legal barrier from practicing his profession); *Webster v. Redmond*, 599 F.2d 793 (7th Cir.1979) (no liberty interest impaired by denial of promotion, since plaintiff remains free to seek alternative employment).

■ Mr. Anderson has not presented evidence that he has been deprived of the right to "work for a living in the common occupations of the community." The evidence shows that Mr. Anderson lost at most the ability to guarantee building permits to buyers of certain lots in a single subdivision. Mr. Anderson remained free to seek other employment, the development of other subdivisions, or even the development of the subdivision at issue in this case.

### 3. *Substantive Due Process*

■ To survive summary judgment on their substantive due process claim plaintiffs must present evidence from which a trier of fact could infer that the Village's decision to deny building permits to plaintiffs' customers (1) deprived plaintiffs of

their property (2) for an irrational or invidious purpose. *Coniston Corporation, supra,* 844 F.2d at 466. Plaintiffs have not done so.

Plaintiffs have not presented evidence from which a jury could reasonably infer that they were deprived of their land; there is no evidence that the rejection of their customers' applications for building permits rendered their land worthless. The Village defendants' decision to temporarily deny building permits to plaintiffs' customers at most deprived them of their "right" to sell property to buyers who insisted on the immediate issuance of building permits. Such a limited incursion into plaintiffs' property rights is not a constitutional deprivation. *Id.*

Neither have plaintiffs presented evidence from which a jury could reasonably infer that the Village defendants acted from a "private" purpose. *Coniston Corporation supra,* 844 F.2d at 467. There is no evidence that the Village defendants acted invidiously, *i.e.* on a racial or other unconstitutional ground. Unless the Village's decision was irrational, therefore, it does not violate substantive due process. *Id.*

 A decision which is based on special interests, which is protectionist, or which is based on mistaken facts or assumptions is not irrational. *Id.; Burrell v. City of Kankakee,* 815 F.2d 1127, 1129 (7th Cir.1987). Only if the Village could not have had a legitimate reason for its decision, *see Pace Resources, Inc. v. Shrewsbury Tp.,* 808 F.2d 1023, 1035 (3rd Cir. 1987), *cited in Coniston Corporation, supra,* 844 F.2d at 467, or the Village's stated reason for acting is not even "debatably" rational, *see Shelton v. City of College Station,* 780 F.2d 475, 483 (5th Cir.1986), *cited in Coniston Corporation, supra,* 844 F.2d at 467, is the Village's decision irrational.

 Unlike the defendants in *Coniston Corporation,* the Village defendants in the present case stated their reasons for denying building permits to plaintiffs' buyers. In November 1980 the Village stated that it would refuse to issue building permits to

plaintiffs' buyers because of the Circuit Court of Lake County's decision that the AJO was not specifically enforceable. Later, in November 1981, the Village told Mr. Semar and Mr. Meister that it would not issue them building permits until Mr. Anderson completed certain public improvements, particularly Schaeffer Road, the access road to the lots in question.

A trier of fact could not reasonably infer from the above evidence that the Village defendants acted irrationally. It is at least debatable that the Village believed (and could believe) that plaintiffs were obligated to complete certain public improvements, including Schaeffer Road. At worst, the Village's decision was mistaken; it was not irrational or invidious.

For the foregoing reasons, this court dismisses plaintiffs' building permit/substantive due process claim.

### 4. Equal Protection

 This court must apply the same test to plaintiffs' equal protection claim as it did to plaintiffs' substantive due process claim. *Unity Ventures, supra,* 841 F.2d at 775 n. 2. This court therefore dismisses plaintiffs' equal protection claim.

### DEFENSES

### 1. Res Judicata

Defendants argue that several state court decisions bar plaintiffs' federal claims: (1) the Circuit Court's 1980 decision on the Petition and Counterpetition to Enforce the Agreed Judgment Order; (2) the Circuit Court's 1984 decision granting summary judgment to the Village officials as to plaintiffs' claims; (3) the Circuit Court's October 26, 1987 decision finding that plaintiffs had not met certain of their obligations under the AJO.

 28 U.S.C. § 1738 requires federal courts to give "the same preclusive effect to state court judgments that those judgments would be given in the courts of the State from which the judgments emerged." *Kremer v. Chemical Construction Corp.,* 456 U.S. 461, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982).

This rule applies with respect to both issues which were actually litigated and those which could have been but were not litigated in the state court proceedings. *Pliska v. City of Stevens Point, Wis.,* 823 F.2d 1168, 1172 (7th Cir.1987). The rule applies when a party seeks to raise a federal constitutional claim which could have been, but was not, raised as a defense in prior state proceedings. *Id.*

This court's determination of whether any of the abovementioned state court decisions bars plaintiffs' federal claims depends upon the effect of those judgments under Illinois law. *Pliska, supra,* 823 F.2d at 1172. Under Illinois law, the doctrine of res judicata is divided into two branches: estoppel by judgment (*res judicata*) and estoppel by verdict (*collateral estoppel*). The doctrine of res judicata provides that a final judgment in a previous action between the parties bars a subsequent action between those parties on the same claim or cause of action. *Edwards v. City of Quincy,* 124 Ill.App.3d 1004, 80 Ill.Dec. 142, 464 N.E.2d 1125 (1984).

The Circuit Court's dismissal in 1980 of the plaintiffs' claim for damages and of the petitions to enforce the Agreed Judgment Order does not bar plaintiffs' federal claims. On August 9, 1983 the Illinois Appellate Court reversed the Circuit Court's 1980 decision. Under Illinois law, a judgment which has been reversed does not have res judicata effect. *See Krych v. Birnbaum,* 101 Ill.App.3d 785, 57 Ill.Dec. 294, 298, 428 N.E.2d 974, 978 (1981); *See also Richard/Allen/Winter, Ltd. v. Waldorf,* 156 Ill.App.3d 717, 109 Ill.Dec. 239, 244, 509 N.E.2d 1078, 1083 (1987) ("the effect of reversal is to abrogate the trial court's judgment and leave the case as it stood prior to the judgment of the trial court.")

For the same reason, the Circuit Court's August 23, 1984 grant of summary judgment does not bar plaintiffs' federal claims. On March 18, 1986 the Illinois Appellate Court reversed the August 23, 1984 decision.

While the Circuit Court's October 26, 1987 decision has not been reversed, it does not, for another reason, preclude plaintiffs' federal claims. On October 26, 1987 the Circuit Court adjudicated the Village's breach of contract complaint (based upon the Agreed Judgment Order) against LGCCE. LGCCE had earlier voluntarily dismissed its counterclaim against the individual Village defendants under Ill. Code of Civil Procedure 2–1009. Ill.Rev.Stat.1983 ch. 110, ¶ 2–1009. That counterclaim had requested damages for, *inter alia,* the Village defendants' breach of the Agreed Judgment Order.

While a defendant who does not raise a matter of defense risks being precluded from later raising the matter as a claim, plaintiffs, by voluntarily dismissing their breach of contract counterclaim, did not fail to raise a *defense* to the Village's breach of contract claim. When a contract is divisible (as the AJO is, *see* October 26, 1987 findings of the Circuit Court of Lake County), one party's failure to perform a contract obligation does not excuse the other party's failure to perform an unrelated obligation. Plaintiffs' federal claims concern conduct, *i.e.* issuance of building permits and approval of a culvert permit, which is unrelated to the conduct involved in the Village's state court complaint, *i.e.* the LGCCE's failure to make certain public improvements.[11] The Village's alleged breach of the Agreed Judgment Order is not, therefore, a complete defense to LGCCE's alleged breach of the same consent decree. *Cf. Henry v. Farmer City State Bank,* 808 F.2d 1228 (7th Cir.1986) (state court defendants did not raise fraud as defense to mortgage foreclosure and later tried to bring RICO claims in federal court); *Village of Gilberts v. Holiday Park Corp.,* 150 Ill.App.3d 932, 104 Ill.Dec. 115, 120, 502 N.E.2d 378, 383 (1986) (Village did not raise ordinance violations in developer's earlier suit for declaration that proposed use was proper.)

Furthermore, LGCCE/Mr. Anderson dismissed their counterclaim for damages against the individual Village defendants

---

11. *See* ¶ 3 of the AJO.

under Ill.Rev.Stat. Ch. 110, ¶ 2–1009, which expressly provides that such dismissal is "without prejudice." *See Ervin v. Sears, Roebuck & Co.,* 127 Ill.App.3d 982, 82 Ill. Dec. 709, 469 N.E.2d 243 (1984); *Liddell v. Smith,* 65 Ill.App.2d 352, 360, 213 N.E.2d 604 (Ill.App.1965); *Cf. Baird & Warner, Inc. v. Addison Indus. Pk.,* 70 Ill.App.3d 59, 64, 26 Ill.Dec. 1, 387 N.E.2d 831 (1979). LGCCE/Mr. Anderson did not, therefore, lose their right to assert their damages claim by voluntarily dismissing it from the state court suit.[12]

Defendants also argue that they are protected by either absolute or qualified immunity. This court will address each type of immunity in turn.

### 2. *Legislative Immunity*

The Village Trustees and the Village Attorney assert that they are immune under the doctrine of legislative immunity for their (1) denial of LGCCE's petition under Ill.Rev.Stat. Ch. 24 ¶ 9–2–40; (2) objections to LGCCE's culvert permit application; (3) denial of building permits to LGCCE buyers.

■ Under *Reed v. Shorewood,* 704 F.2d 943, 952 (7th Cir.1983) local officials are absolutely immune from liability for acts taken in a legislative, rather than administrative capacity. The Village trustees and the Village attorney are thus absolutely immune only if their acts were "legislative" in nature.

District courts in the Seventh Circuit hold that legislative acts involve "the promulgation of general or prospective legislation or establish guidelines by which the future conduct of certain groups is to be judged." *Coffey v. Quinn,* 578 F.Supp. 1464, 1467 (N.D.Ill.1983); *Unity Ventures v. County of Lake,* 631 F.Supp. 181, 206 *aff'd* 841 F.2d 770 (7th Cir.1988).

■ Administrative acts involve the application of ordinances or policies to specific instances. *Id. But see Mirshak v.*

*Joyce,* 652 F.Supp. 359, 364 (N.D.Ill.1987) (decision to downzone particular property is legislative act). Courts hold, however, that a decision affecting a particular individual may be legislative if it is part of a budget cutback or another decision with general ramifications. *See e.g. Rateree v. Rockett,* 630 F.Supp. 763, 771 (N.D.Ill.1986); *Callaway v. Hafeman,* 628 F.Supp. 1478, 1487 (W.D.Wis.1986).

■ With these principles in mind, this court holds that those defendants who were on the Board of Local Improvements and voted to deny LGCCE's petition under Ill.Rev.Stat. ch. 24 ¶ 9–2–40 are absolutely immune from liability arising from that act. While the Board of Local Improvements' decision affected only one "person"—LGCCE—the Board had to consider conflicting policies when evaluating LGCCE's petition. And decisions of the Board of Local Improvements have general ramifications, as the Board's recommendations include the nature of the local improvement and how the improvement shall be paid for, *i.e.* whether in part or wholly by special assessment, or by special taxation. Moreover, in this case, the Board of Local Improvements took acts solely within the core of their statutory responsibility.

■ But those members of the Village Board of Trustees who (1) acquiesced in the Village's objections to LGCCE's culvert permit application; and (2) voted to deny building permits to LGCCE buyers are not absolutely immune from liability for these acts. Assuming that, by participating in the January 2, 1979 and February 13, 1979 meetings, the Board of Trustees adopted the Village's objections to the LGCCE permit application, such objections (1) were not within the Board of Trustees' statutory duties and (2) involved a single Village resident—Mr. Anderson or LGCCE. And, unlike the Board of Local Improvements' decision to deny plaintiffs' Section 9–2–40 petition, the Board of Trustees' decision to object to plaintiffs' construction project did

---

12. While in their Answer to the Village's state court complaint, LGCCE pled the Village's failure to (1) issue building permit facts; (2) approve the Buffalo Creek culvert permit, LGCCE apparently did not present any evidence as to the Village's conduct. Thus, plaintiffs did not actually litigate the facts underlying their federal litigation.

not have general financial ramifications. The Village Board of Trustees' decision to object to LGCCE's culvert permit application was therefore an administrative decision.

 Similarly, the Board acted in an administrative capacity when it denied building permits to LGCCE buyers; the Board applied already enacted policies or ordinances to specific instances. *Creekside Associates, Inc. & Oak Park Trust & Savings Bank v. City of Wood Dale et al.*, 684 F.Supp. 201 (N.D.Ill.1988); *First National Bank of Highland Park, et al. v. Village of Schaumburg et al.*, [available on WESTLAW, 1987 WL 17468] 1987 U.S. Dist. LEXIS 8643 (N.D.Ill.1987); *Rateree v. Rockett*, 630 F.Supp. 763, 771 (N.D.Ill. 1986).

This court concludes that defendants Althans, Swaback, Ausman, Sklar and Homburg are absolutely immune from liability only as to their failure to grant LGCCE's Section 9-2-40 petition.

▆▆▆ Finally, Defendant Mr. Mullen argues that, as Village Attorney, he is absolutely immune from liability for his acts. This court disagrees. This court does not believe that the policies underlying absolute immunity for local legislators apply to Mr. Mullen.

### 3. *Qualified Immunity*

▆▆▆ The individual defendants assert that they are qualifiedly immune from damages liability arising from their actions. Because this court concludes that defendants did not violate plaintiffs' constitutional rights, a *fortiori*, this court also concludes that it was not clearly established in 1978–82, when the defendants took the challenged actions, that they were violating plaintiffs' constitutional rights. Therefore, to the extent that these individual defendants are not entitled to absolute legislative immunity, they are entitled to qualified immunity.

### 4. *Sovereign Immunity*

▆▆▆ This court also holds that Ms. Kabbes is not entitled to assert sovereign immunity. This court concludes that, based on the totality of the circumstances, this suit is one against Ms. Kabbes in her individual, rather than official capacity. *See Hadi v. Horn*, 830 F.2d 779, 783 (7th Cir.1987).

### CONCLUSION

Upon reconsideration, for the reasons stated herein, defendants' motion for summary judgment is again GRANTED. Defendants' motion to strike Mr. Anderson's latest affidavit is GRANTED.